**H. K. PORTER COMPANY, INC.**

v.

**NICHOLSON FILE COMPANY et al.**

**Civ. A. No. 4899.**

United States District Court,
D. Rhode Island.

Nov. 30, 1972.

Supplemental Opinion Dec. 18, 1973.

Edward L. Maggiacomo and John F. Corrigan, of Adler, Pollack & Sheehan, Providence, R. I., Carl F. Barger, and C. Arthur Wilson, Jr., of Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for plaintiff.

Edward F. Hindle, and John H. Blish, of Edwards & Angell, Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

On rebound from the failure of its tender offer to defendant Nicholson's shareholders, plaintiff comes into this Court seeking damages for alleged misrepresentations made by Nicholson to its shareholders in fighting that tender offer. Plaintiff alleges that Nicholson and its directors have violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j as amended; Rule 10b–5 of the Securities Exchange Commission, promulgated thereunder, 17 C. F.R. 240.10B–5 (1972), and Section 14 (e) of the Act, 15 U.S.C. § 78n(e).

On March 7, 1972, Porter mailed a request for tenders to Nicholson stockholders, obligating itself to purchase 437,000 shares of common stock at $42 per share if tendered by April 4, 1972, or any extension of that date. The letter also provided that if fewer than 437,000 shares were tendered, Porter could purchase such lesser number of shares. In fact, on the extended date of April 14, 1972, Porter purchased the 132,292 shares that had been tendered.

Between the making of Porter's offer and the closing date, Nicholson, the target corporation, sent a series of letters to its shareholders attempting to dissuade them from tendering. Plaintiff alleges that defendants willfully embarked upon a fraudulent scheme, first recommending that the shareholders defer action and then announcing that there were merger plans between Nicholson and another company, Walco, which were preferable to the Porter tender offer. Later, Nicholson communicated to its shareholders that there was the possibility of merger with yet another company, VLN, and recommended this merger over the Porter tender offer. These communications were by use of an instrumentality of interstate commerce, that is, the mails. Porter contends that communications about the mergers were false and misleading in that the mergers were nothing more than a sham. The letters complained of are set out in the margin.[1]

1. "To the Stockholders of Nicholson File Company:

As you may already be aware, H. K. Porter Company, Inc., is making a request for tenders of 437,000 shares of Nicholson File Company common stock at a net price of $42 per share. The request for tenders will expire at four o'clock P.M., EST, on Tuesday, April 4, 1972, unless extended by Porter.

I am writing to assure you that your Company's management is studying the matter and will, on or before March 24, 1972, advise you as to its recommendation with respect to your acceptance or rejection of Porter's request.

You are accordingly requested to defer making a determination as to whether or not you should accept or reject Porter's request until you have received management's recommendation with respect thereto.

Very truly yours,
NICHOLSON FILE COMPANY
George C. Williams /s
George C. Williams
President

March 8, 1972"

"March 22, 1972
TO THE STOCKHOLDERS OF
NICHOLSON FILE COMPANY:

In my letter to you of March 8, 1972, I promised to communicate with you further with respect to the proposal by H. K. Porter Company, Inc. to purchase 437,000 shares of your Company's common stock at $42 per share.

Porter *is not* proposing a merger or consolidation of Nicholson and Porter which would require approval of your management. Instead, it is making an offer directly to you. While the decision *is yours and yours alone*, we think it is important to caution our shareholders against taking any hasty action.

Since the offer was announced, we have been contacted by a number of substantial corporations, each desiring to discuss merging with or acquisition of your Company. While we have to date no other definitive offers in hand, your management is holding active discussions in an effort to secure the best possible result for our stockholders. You will be

informed promptly of any material developments resulting from our discussions.

Have you asked yourself why Porter is so eager to buy your shares? It stands to reason that if Porter is willing to pay you $42 per share for your stock, it must see a value higher than its offer. We believe this offer would not have been made without a careful appraisal of your Company and the conviction that Nicholson File has excellent prospects for the future. In fact, Porter is so eager to acquire your stock that it is offering an inducement to brokers of $.80 per share —double the normal New York Stock Exchange round lot commission on a $42 stock—for each share they get you to turn in.

Although the price offered by Porter is above the quoted price for your stock immediately preceding the offer, it is substantially less than the book value per share of approximately $52.75. It is also less than the market high for as recently as 1968.

We strongly suggest that you not act hastily. This offer is on a pro-rate basis and not on a first-come, first-serve basis. Therefore, there is absolutely no benefit to you in tendering your shares now. The offer is open until April 4, 1972 and may be extended until May 5, 1972. During that period you would, in effect, be giving a free option to Porter to purchase your shares. You could not recover your stock to sell it if the market price exceeds the tender price or accept a better offer if one is made. The stock would be out of your control. Porter, on the other hand, can sit back, watch the market, and act accordingly.

By not depositing your stock now, you preserve total freedom of action. Under the terms of the offer, you may, if you wish, participate in the full offer with full protection by delaying any action until the last day of the offer. However, to assure that you will be in a position to act on April 4, you may wish to make arrangements now to be ready to deposit your shares on the last day of the offer if you should then so desire."

"March 29, 1972
TO THE STOCKHOLDERS OF
NICHOLSON FILE COMPANY:

We are pleased to report that with the approval of their respective Boards of Directors Nicholson File Company and Walco National Corporation have each signed the agreement providing for the merger of Nicholson into Walco about which we wrote you on March 28. Under the terms of the agreement, each share of Nicholson common stock will be converted into 1.666 shares of Walco common stock, with fractional interests being paid in cash, based on the market value of Walco shares at the effective date of the merger. Yesterday's closing price on the American Stock Exchange for Walco common stock was $23.75.

Your Directors have endorsed the Walco merger as a better alternative to the Porter tender offer and have stated that *none of them intends to tender a single share to Porter*. Mr. Nicholson has advised the Board that the Nicholson family and their relatives do not intend to tender to Porter any of the approximately 86,000 shares that they own. We hope you will follow our lead.

You should also know that we filed today in the Federal District Court in Providence, Rhode Island a lawsuit against Porter, Mr. Thomas M. Evans (Porter's Chairman), Reb & Co. (a Porter nominee), and Evans & Co., Inc. (a New York brokerage firm of which Mr. Evans is President). We believe and have alleged in our lawsuit that Porter has committed serious violations of the federal securities laws in connection with its tender offer to you. Porter has taken actions and made statements which we believe are false and misleading and were made in an attempt to stampede you into tendering your shares. We hesitated in bringing the action but felt it necessary in the interest of all our stockholders because we believe the violations of the federal securities laws are severe and have injured Nicholson File Company and its stockholders.

In recommending that you not turn your Nicholson shares in to Porter, your Board wishes to call your attention to some additional and important considerations:

1. By not tendering your shares to Porter you can have a continuing interest, both financial and otherwise, in Nicholson File Company, its people, its history and its prospects.

2. Nicholson has paid dividends in each of the last 100 years and is currently paying dividends at the annual rate of $1.60 per share. Walco has heretofore tended to plow its profits back into the business, resulting in the payment of small cash dividends supplemented by stock dividends. However, Walco has stated that upon the consummation of the merger it intends to establish a dividend policy for all its stockholders 'consistent with the dividend rate currently enjoyed by Nicholson stockholders and

During the flurry of letter writing, Nicholson employed another weapon in its attempt to defeat the tender offer. Nicholson brought suit against Porter in this Court, alleging violation of Section 13(d)(1) of the Securities Exchange Act of 1934, as amended; Section 10(b) of the Act, and Rule 10b–5 of the Securities Exchange Commission. This Court issued a temporary restraining order, restraining Porter from acceptance of stock tendered, pending an evidentiary hearing on motion for preliminary injunction. Nicholson communicated the facts of its lawsuit and of the restraining order to its shareholders. Porter alleges that this communication was misleading.[2] Nicholson's motion for

consistent with earnings and capital expenditures.'

3. Again, you all know the value of a tax free exchange as compared with a taxable transaction. The Walco merger will be tax free—a sale to Porter will result in a tax upon your profit.

It is difficult for management to comment on what the position of stockholders who stay with management and do not deposit their shares with Porter will be, should Porter gain control. Your Board carefully considered this in deciding not to deposit their shares with Porter. Should Porter gain control of Nicholson, Porter, and not any minority stockholder group, would be able to elect its personally chosen directors and designate operating personnel. However, your basic equity in Nicholson would remain the same and you would share in its continuing profits.

It is in light of the foregoing that your Board of Directors has recommended your rejection of the Porter proposal and your retention of your Nicholson shares, pending approval of and consummation of the proposed merger with Walco.

Under the agreement, Nicholson and Walco are to submit the merger to their respective shareholders for approval not later than June 30, 1972. At that time, you will be provided with a complete copy of the agreement, together with a description of Walco and related financial material. For your information, Walco is a diversified manufacturing and merchandising company with six subsidiaries, and makes caskets, motor parts and machine tools.

We may not communicate with you again before the so-called April 4 filing deadline, but we intend to proceed with the proposed merger with diligence. If in the meantime there are any developments which materially affect the recommendation being made to you by the Board of Directors you will be promptly advised.

Very truly yours,
NICHOLSON FILE COMPANY
George C. Williams /s
George C. Williams
President

Paul C. Nicholson, Jr. /s
Paul C. Nicholson, Jr.
Chairman of the Board"

2. "March 31, 1972
PORTER TENDER OFFER BLOCKED

This morning the United States District Court of Rhode Island enjoined H. K. Porter Company, Inc., Thomas M. Evans (Chairman of Porter), and other named defendants, and 'all persons acting through, by and for any one of them' from, among other things, 'acquiring or attempting to acquire any shares of the stock of Nicholson' and from 'soliciting from any Nicholson stockholder any proxy, consent or authorization, or their support to vote stock of Nicholson.'

What this means, in effect, is that *Porter is prohibited* from purchasing any shares that have been tendered to it and *is further prohibited* from taking any additional action to encourage Nicholson shareholders to tender their shares to Porter at least until April 10—and longer if the order is extended.

The order was granted based on Nicholson's complaint, previously filed with the Court, that Porter, Evans and the other members of the Porter group embarked on a scheme to obtain control of Nicholson in violation of the federal securities laws. The Porter group has been ordered to show cause on April 10 why the injunction should not be continued.

In view of the legal impediments now existing to the Porter offer, we strongly repeat our earlier recommendation to you: That you *not turn in* your shares to Porter, but that you retain them so that you may reach an intelligent and informed decision as to your alternatives. Remember, once you turn in your

preliminary injunction was denied and its § 10(b) and Rule 10b–5 claims dismissed. Nicholson File Company v. H. K. Porter, 341 F.Supp. 508 (D.R.I.1972).

shares to Porter you may not withdraw them without Porter's consent.

Some of you who have already tendered your shares to Porter have asked how you can get your shares back from Porter. In view of the foregoing developments many more of you may have the same question. We suggest that you write directly to Porter's depository and demand the return of your shares. The name and address of the depository is: State Street Bank and Trust Company, P.O. Box 5003, Boston, Massachusetts 02107.

We will be in further communication with you in case of any material developments.

Very truly yours,
NICHOLSON FILE COMPANY
George C. Williams /s
George C. Williams
President

Paul C. Nicholson, Jr. /s
Paul C. Nicholson, Jr.
Chairman of the Board"

3. Plaintiff also complains of misleading press releases:

"April 3, 1972
FOR IMMEDIATE RELEASE

Nicholson File Company of East Providence, Rhode Island, has received a merger proposal from VLN Corporation, Paul C. Nicholson, Jr., and George C. Williams, Chairman and President respectively, of Nicholson File Company announced today. The Nicholson Board of Directors met this morning and unanimously endorsed the new merger proposal as preferable to both the recent H. K. Porter Company, Inc., tender offer and the proposed merger with Walco National Corporation, which was announced last week. Walco had proposed a merger providing for the exchange of 1.666 shares of Walco common stock for each share of Nicholson common stock. In making the announcement, however, Mr. Williams said that Walco has advised him that Walco is in the process of considering a revised offer.

Mr. Williams said that the proposed Nicholson-VLN merger would provide for the issuance on a tax free basis of one share of VLN cumulative convertible voting preferred stock bearing a $1.60 annual dividend for each share of Nicholson common stock outstanding. The VLN preferred stock will be convertible into five shares of VLN common stock

Porter alleges that defendants' communications and actions described above [3] were pursuant to a fraudulent scheme and were false and misleading so

during the first year following the merger and thereafter convertible on a sliding scale until the fourth year. From the fourth year on, the VLN preferred stock will be convertible into four shares of VLN common stock. On March 30, VLN common stock closed at a price of $10 per share on the American Stock Exchange, and at twelve o'clock noon on April 3, was trading at 10⅜ per share.

Other terms are that the VLN preferred stock would be callable at $50 per share after the fifth year and would have voluntary and involuntary liquidating rights of $50 per share. VLN has agreed to list the new preferred stock on the American Stock Exchange.

Mr. Williams said that a definitive merger agreement between Nicholson and VLN would be subject to formal approval by stockholders and boards of both companies. He noted that while Porter is seeking 80 percent of the Nicholson stock the approval required by stockholders in a merger is only a simple majority.

VLN manufactures new and replacement automotive and marine products, radiation measuring instruments, duplicating and other office machines and felt products. In 1971 VLN had sales of $100 million.

Mr. Williams emphasized that none of the 86,000 shares owned by members of the Nicholson family and none of the shares owned by any Nicholson directors will be tendered to Porter. These holdings total approximately 15.5 percent of Nicholson outstanding shares.

Mr. Nicholson added that Porter's latest letter to Nicholson stockholders, mailed after Nicholson brought its lawsuit, *permits any stockholder who turned his stock in* to Porter between March 25 and April 3, *to immediately withdraw his stock.* Both Mr. Nicholson and Mr. Williams said they knew of Nicholson stockholders who turned in their stock during that period without knowing of the Walco or the VLN merger proposals. The Porter letter says that the Nicholson stockholder can get his stock back from Porter 'provided he gives written notice thereof, by letter or telegram, to State Street Bank and Trust Company, 225 Franklin Street, Boston, Massachusetts 02107, prior to 3:00 p. m. E.S.T., April 10, 1972. Such notice must be physically received by the Depository prior to such time in order to be effective.' In the

as to induce Nicholson stockholders to refrain from tendering and so defeating Porter's tender offer. Porter alleges it was damaged in an amount not yet ascertained but believed to be in excess of three million dollars.

Defendants have moved to dismiss under Fed.R.Civ.P. 12(b)(6) on the grounds that Porter has failed to state a claim on which relief can be granted under either Section 10b or Section 14(e) of the Act. Defendants argue that Porter lacks standing to maintain an action under Section 10(b) and Rule 10b–5, being neither a defrauded purchaser nor seller. Defendants further argue that the Section 10(b) and Rule 10b–5 claims must be dismissed because plaintiff has failed to allege that the damages suffered were caused by and the proximate result of the alleged violation. As to the claim under Section 14(e), defendants argue it must be dismissed because Section 14(e) does not provide a right of action for damages, either expressly or by implication, in favor of a tender offeror against a target corporation. As to the Section 14(e) claim, defendants also argue that plaintiff has failed to allege that its damages were caused by and the proximate result of the alleged violation.

Jurisdiction of this action is based on Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. Although it appears that diversity jurisdiction is also present, I do not read the complaint to raise any claims based upon state-law created causes of action.

■ On motion under Fed.R.Civ.P. 12(b)(6), a complaint should not be dismissed unless it appears beyond doubt

same letter Porter disclosed that only 59,308 shares of Nicholson stock had been turned in through March 30.

'With the new merger proposal and the improved current price for Nicholson stock, I expect Porter to be flooded with demands to return tendered shares,' concluded Mr. Williams."

"PRESS RELEASE ISSUED
APRIL 5, 1972

George C. Williams, President and Chief Executive Officer of Nicholson File Company, said that he was not surprised by the number of shares tendered to H. K. Porter pursuant to the Porter tender offer. Company officials have been in personal contact with many stockholders in the last two days, he said, but most stockholders have not yet received Nicholson's letter of April 3 and are, therefore, probably not aware of the new merger proposal from VLN Corporation or that many of them have the absolute right to get the immediate return of their stock from Porter.

'What was missing from Porter's announcement of the shares turned in by April 4, and what I think is very important,' he said, 'is whether that figure includes any shares for which demands for return have now been made—and if so, how many.' 'I know,' he said, 'that some demands have already been made. In just the past two days stockholders owning approximately 14,000 shares have told us they are demanding the return of their stock from Porter. In addition, stockholders with approximately 11,000 shares have indicated to us they are now considering the same action.

'We are confident that when other stockholders learn of the VLN proposal they will flood Porter with demands for the return of their stock and that the Porter bid for control of Nicholson File Company will be soundly defeated.

'Porter needs to own 292,054 Nicholson shares in order to have a guaranteed block against a merger vote in Rhode Island. He's a long way from that.

'We encourage every stockholder who has tendered his stock to Porter to demand its immediate return. Our Board thinks the VLN proposal is very attractive, and has unanimously endorsed it, and we are moving ahead as rapidly as possible. For every share of Nicholson stock our stockholders would get one share of VLN preferred stock paying dividends of $1.60 a year, immediately convertible into five shares of VLN common stock. Yesterday, the closing price of VLN common stock was $10.62. On the basis of that conversion ratio and that closing price, each share of *VLN preferred stock would have an indicated value of $53.10*. On the other hand, H. K. Porter, which extended its tender offer to April 14, is still offering only $42 a share.

'To demand the return of your stock write to:
 State Street Bank and Trust Co.
 225 Franklin Street
 Boston, Massachusetts 02107' "

that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed. 2d 80 (1957).

*Rule 10b–5 and Section 10(b)*

In arguing that plaintiff has failed to present a claim under Rule 10b–5 and Section 10(b) defendants rely on the doctrine of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert. den. 343 U.S. 956, 72 S.Ct. 1051, 96 L. Ed. 1356 (1952). *Birnbaum* held that the protection of Rule 10b–5 did not extend to breaches of fiduciary duty by corporate insiders resulting in fraud on minority shareholders who were neither purchasers or sellers of securities. The court ruled that Section 10(b)

> "was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs, and that Rule X–10B–5 extended protection only to the defrauded purchaser or seller."

193 F.2d at 464

The doctrine that a plaintiff must be a purchaser or seller of securities in order to have standing under Section 10(b) and Rule 10b–5 is, as defendants have argued, very much alive, see Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968), although much criticized, see e. g. Entel v. Allen, 270 F.Supp. 60, 70 (S.D.N.Y. 1967), Lowenfels, The Demise of the Birnbaum Doctrine: A New Era for Rule 10b–5, 54 Va.L.Rev. 268, 275–76 (1968). The *Birnbaum* doctrine has not been ruled upon by the Supreme Court; see Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); S. E. C. v. National Securities, Inc., 393 U. S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), nor do I find any case law from the First Circuit Court of Appeals addressing the issue.

Defendants rely primarily on Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. den. 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970), which applied *Birnbaum* to deny standing to an unsuccessful tender offeror on facts substantially the same as those in the case at bar. Plaintiff in *Iroquois* made a tender offer to the stockholders of defendant Syracuse. Syracuse sent letters to its stockholders asking them not to tender and falsely stating that Syracuse was negotiating a merger with Towle. In fact there never was any intention to merge with Towle and the letters were meant to mislead and interfere with the tender offer. Syracuse urged that stockholders sell their shares to members of the management of Syracuse. The tender offer was unsuccessful and Iroquois sued for violation of Section 10(b) and Rule 10b–5. The court characterized Iroquois' claim as follows:

> "Iroquois is not here complaining that it was misled by the acts of defendants as to any purchases or sales by it of Syracuse China stock; indeed, its basic complaint is that, because of the acts of defendants, it could not purchase such shares. In effect, Iroquois complains of fraud by defendants on the stockholders of Syracuse . . . .."

417 F.2d at 967

Finding that Iroquois was neither a defrauded purchaser nor a defrauded seller, the Court granted defendants' motion to dismiss.

The neat packaging job done by the *Iroquois* court of the issue at bar was unraveled and undone by the decision of the Second Circuit Court of Appeals a month later in Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969), cert. den. 400 U.S. 822, 91 S. Ct. 41, 27 L.Ed.2d 50 (1970). *Crane* granted standing to sue for damages under Section 10(b) and Rule 10b–5 to an unsuccessful tender offeror. Plaintiff in *Crane* made a tender offer to the stockholders of Air Brake, which offer would expire on April 19, 1968. Air Brake, attempting to fend off Crane, entered a merger agreement with Standard, Crane's largest competitor. During the last week of Crane's tender offer,

Air Brake mailed its stockholders proxy statements soliciting proxies in favor of the proposed Standard merger. During this week Standard made substantial purchases of Air Brake stock. On the last day of the tender offer, Standard bought very heavily of Air Brake stock, driving its price up. As the *Crane* court observed:

"The net result of this buying was to represent to the public, whose primary source of information is the tape, that there was a great demand for Air Brake at an increased value. It is reasonable to conclude that many Air Brake stockholders who might otherwise have chosen to tender to Crane chose not to do so because their own holdings in Air Brake looked better as the price went up."

419 F.2d at 792.

Unknown to the investing public was the fact that Standard resold most of its recently acquired shares immediately in a private secret sale to Investors Diversified Services and Dillon Read at a price well below the excited market price. Crane's tender offer to gain control of Air Brake was unsuccessful. Air Brake and Standard merged, leaving Crane in the position of owning preferred stock in its chief competitor, Standard. Under threat of a divestiture action to be brought by Standard under the antitrust laws, Crane sold most of its shares of Standard, albeit at a profit.

The court in *Crane* found violations of Section 9(a)(2) and Section 10(b) of the 1934 Act and standing in plaintiff to raise both of these claims. Although it is unclear, it appears that Crane was characterized as a "forced seller" for purposes of standing under Section 9(a)(2), but that standing under Section 10(b) turned on a showing of a causal connection between the fraud and the damage claim:

"The standing issue arises in another context with respect to the purchaser-seller limitation, which arises from the language of both section 9(a)(2) and Rule 10b–5. Section 9(a)(2) pro-

hibits manipulation 'for the purpose of inducing the purchase or sale of such security by others,' while Rule 10b–5 similarly prohibits deception upon 'any person in connection with the purchase or sale of any security.'

Although this court adhered to a fairly strict construction of the purchaser-seller requirement in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and in Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir., Nov. 3, 1969), there was in Birnbaum no indication of a causal connection between the alleged violation of Rule 10b–5 and the injury to the corporation and its shareholders. The requirement has been interpreted fairly broadly in cases since Birnbaum. In Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967), we held that shareholders of a corporation had standing under Rule 10b–5 to obtain injunctive relief to prevent controlling persons from depressing the price of the corporation's stock by market manipulation, even though the complaining shareholders had purchased their shares prior to the manipulation and had not yet sold them. The damage claim was dismissed for lack of a causal connection, id. at 547. . . . In damage actions, this court in Symington Wayne Corp. v. Dresser Industries, Inc., 383 F.2d 840, 842 (2d Cir. 1967), referred to the decisions in A. T. Brod & Co. v. Perlow, supra, and Vine v. Beneficial Finance Co., supra, as having 'expressly left undecided the question whether one who is neither a purchaser nor a seller can attack a transaction under Rule 10b–5.' Iroquois declined to allow relief in a tender offer situation where plaintiff was neither a purchaser nor a seller.

The present case falls within the rationale of Vine, where we held that a minority shareholder in a short form merger is a 'seller' since he is entitled only to cash for his shares. See also

Dasho v. Susquehanna Corp., 380 F.2d 262 (7 Cir.), cert. denied Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967). The effect of Standard's deception and manipulation was to deter Air Brake shareholders from tendering to Crane. The success of Standard's maneuver made Crane a forced seller of the newly issued Standard convertible preferred under threat of a divestiture action to be brought by Standard under the anti-trust laws. Thus, we have here in Crane one induced to sell by Standard's deception and manipulation and so within the protection of section 9(a)(2). *Moreover, even if a narrower view were taken of section 9(a)(2), it would seem that Standard's conduct would still be actionable under Rule 10b–5(c), condemning conduct which operates as a fraud or deceit 'upon any person.'*

The purchase-sale requirement must be interpreted so that the broad design of the Exchange Act, to prevent inequitable and unfair practices on securities exchanges and over-the-counter markets, is not frustrated by the use of novel or atypical transactions. A. T. Brod & Co. v. Perlow, supra, 375 F.2d at 397. 'In determining who has standing to enforce duties created by statute, a court's quest must be for what will best accomplish the purposes of the legislature.' Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 946 (2d Cir. 1969). The purpose of Congress in enacting sections 9(a)(2) and 10(b) was to protect the investing public from manipulation and deception by the use of devices which defrauded or misled investors in securities transactions."

419 F.2d at 797–798 (emphasis added) While some courts have viewed standing in *Crane* as turning on Crane's being a "forced seller," and thus constructively a defrauded seller under *Birnbaum,* see Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339, 347 n. 15 (9th Cir. 1972); Hirsch v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 311 F.Supp. 1283, 1289–1290 (S.D.N.Y.1970), I find the inter-

pretation given *Crane* by Judge Adams in Kahan v. Rosenstiel, 424 F.2d 161 (3rd Cir. 1970), cert. den. 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), to be more persuasive. *Kahan* found that *Crane* was not limited to "forced seller" situations, 424 F.2d at 172, and commented:

"It may be worth noting that it was not the ultimate sale of stock by Crane which caused its alleged damage. Crane claimed that the misrepresentation and manipulation by Westinghouse caused the shareholders of Westinghouse to reject Crane's tender offer, and it was this that injured Crane."

424 F.2d at 172

See also, Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 307 F.Supp. 910 (S.D.N.Y.1969), aff'd 425 F.2d 842 (2d Cir. 1970). The damage caused was unrelated to Crane's status as a "forced seller." It would seem odd to have standing in these 10b–5 situations turn on such an extrinsic fortuity. See 23 Van.L.Rev. 885, 889 (1970). As the Supreme Court has said of questions about the application of Rule 10b–5 and Section 10(b)—"[t]hey arise in an area where glib generalizations and unthinking abstractions are major occupational hazards." S. E. C. v. National Securities, 393 U.S. at 465, 89 S.Ct. at 571.

However, I do not find it necessary to determine whether application of the *Birnbaum* doctrine would dictate that this plaintiff lacks standing to bring this Section 10b and Rule 10b–5 action. I find that Section 14(e) of the 1934 Act, as amended, 15 U.S.C. § 78n(e), resolves any doubts about plaintiff's standing and provides no lesser relief than would be available under Section 10(b).

*Section 14(e)*

Section 14(e) of the Securities Exchange Act of 1934, as amended, 15 U. S.C. § 78n(e) provides:

"(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any

material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

As has been noted, Section 14(e) "largely tracks the substantive provisions of Rule 10b–5." Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 945 (2d Cir. 1969). Judge Friendly has said:

"In effect, [Section 14(e)] applies Rule 10b–5 both to the offeror and to the opposition—very likely, except perhaps for any bearing it may have on the issue of standing, only a codification of existing case law."

Electronic Specialty Co. v. International Controls Corp., 409 F.2d at 940–941.

While Section 14(e) does not on its face grant private rights of action, such actions have been implied where a target corporation and both tendering and non-tendering shareholders claim Section 14(e) violations by the tender offeror and seek injunctive relief. *Electronic Specialty, supra*; Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d 1075 (5th Cir. 1970); Butler Aviation International v. Comprehensive Designers, Inc., 425 F.2d 842 (2d Cir. 1970).

Whether a private right of action on behalf of a tender offeror for damages may be implied from Section 14(e) depends upon an analysis of the purpose of that statute.

"[I]njury caused by a violation of a statute does not provide a basis for a private civil suit unless the statute was enacted for the protection of the class of which the injured party is a member."

Greater Iowa Corp. v. McLendon, 378 F.2d 783, 791 (8th Cir. 1967)

Finding an implied private right of action under Section 14(a), the Supreme Court in J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L. Ed.2d 423 (1964) stated, ". . . it is the duty of courts to be alert to provide such remedies as are necessary to make effective the congressional purpose."

The legislative history on Section 14(e) is rather sparse:

"Subsection (e)—Fraudulent transactions.—Proposed · subsection (e) would prohibit any misstatement or omission of a material fact, or any fraudulent or manipulative acts or practices, in connection with any tender offer, whether for cash, securities or other consideration, or in connection with any solicitation of security holders in opposition to or in favor of any tender offer. *This provision would affirm the fact that persons engaged in making or opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of the tender offer are under an obligation to make full disclosure of material information to those with whom they deal.*" (emphasis added)

1968 U.S.Code Cong. and Admin.News p. 2821

Section 14(e) was part of the 1968 Amendment to the Securities Exchange Act of 1934 known as the Williams Act. The legislative history of the Williams Act indicates an intent to provide adequate information to shareholders so that they can make rational decisions as to cash tender offers and takeover bids. 1968 U.S.Code Cong. and Admin.News, pp. 2811–12. Defendants argue that the purpose of § 14(e) "is the protection of shareholders and not the indemnification of the corporate participants in a battle for corporate control," and, thus, that a private right of action should not be implied for a tender offeror. Defendants properly concede that a tender offeror

would have standing to seek equitable relief, and point to Judge Friendly's language in Electronic Specialty Co. v. International Controls Corp., *supra*, that

> ". . . the application for a preliminary injunction is the time when relief can best be given. . . .
>
> [D]istrict judges would do well to ponder whether, . . . the opportunity for doing equity is not considerably better then than it will be later on. The court will have a variety of tools usable at that stage. . . ."
>
> 409 F.2d at 947

This approach offers little comfort after the tender offer has expired, see Note, Cash Tender Offers, 83 Harv.L.Rev. 377, 398–400 (1969), particularly to one who could not discover the fraudulent practices until then.

■ In Dyer v. Eastern Trust and Banking Co., 336 F.Supp. 890, 913–914 (D.Me.1971). Judge Gignoux granted standing to a shareholder of the tender offeror to claim damages for violation of Section 14(e) by the tender offeror in its attempt to exchange its own shares for the shares of stockholders in three banks it wished to acquire. The *Dyer* court recognized that:

> "Unlike Section 10(b), Section 14(c) contains no hint of a purchaser-seller requirement. The decided cases under Section 14(e) have granted standing to claim its protection to the corporation which is the target of the takeover bid, Electronic Specialty Co. v. International Controls Corp., supra, to nontendering shareholders of the target corporation, id. Fabrikant v. Jacobellis, [CCH Fed.Sec.L.Rep. paragraph 92, 686 (E.D.N.Y.1970)]; Neuman v. Electronic Specialty Co., [CCH Fed.Sec.L.Rep. paragraph 92,-591 (N.D.Del.1969)]; and to the tender offeror itself, Crane Co. v. Westinghouse Air Brake Co., [supra].
>
> 336 F.Supp. at 890

That plaintiff in the case at bar has standing under Section 14(e) follows from both the case law and the statutory purpose.

■ Both *Crane* and *Dyer* support plaintiff's standing to claim damages. *Crane* is nearly identical recognizing standing in a tender offeror to claim damages for misrepresentations made by a target corporation to its own shareholders attempting to dissuade them from offering, 419 F.2d at 798–99. *Dyer* establishes that shareholders of the offeror are within the class for whom the protection of Section 14(e) is meant. While *Dyer* involved misrepresentations·made by the tender offeror to its own shareholders and damage caused by involving these shareholders in an unfavorable tender offer, damage to the tender offeror's shareholders can also result from situations like the one at bar. The expenses to which a tender offeror corporation is put in making its tender offer, only to have that offer defeated by fraud or misrepresentations by the target corporation, is of obvious concern to the offeror's shareholders. In some respects plaintiff here is acting to protect the interests of its own shareholders.

■ The plain language of Section 14(e), as well as its legislative history, indicate that a tender offeror has standing to seek damages for misrepresentations made by the target corporation. Defendants should not be immunized from payment of proven damages because plaintiff, busy defending a suit brought against it by Nicholson, see 341 F.Supp. 508 (D.R.I.1972), did not sue earlier to obtain injunctive relief. It is reasonable to expect that in many cases information that merger plans announced during a heated tender offer contest were false or misrepresented would not be available until after the tender offer had expired. Congress did not intend to favor either the offeror or the target corporation by passage of the Williams Act. Defendants would have the Act read to favor the target corporation.

Defendants argue the "anomaly" that damages must be unavailable because an award of damages would ultimately hurt the target's shareholders, the supposed beneficiaries of the Williams Act. This argument ignores another class of beneficiaries: the shareholders of the tendering corporation who must ultimately bear the damages suffered by the offeror. In any event, defendants' argument must fail in light of J. I. Case v. Borak, *supra*, and Mills v. Electric Auto-Lite, 396 U.S. 375, 90 S. Ct. 616, 24 L.Ed.2d 593 (1970), which found that plaintiffs who complain of misrepresentations in proxy solicitations are not limited to prospective relief. Defendants' argument proves too much: it applies wherever there is recovery against the target corporation, regardless of the identity of the plaintiff. Defendants also mistake the purpose of damages in a securities law action. Damages are yet another enforcement mechanism of the securities laws. The Supreme Court commented in J. I. Case v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423:

> "Private enforcement of the proxy rules provides a necessary supplement to Commission action. As in antitrust treble damage litigation, the possibility of civil damages or injunctive relief serves as a most effective weapon in the enforcement of the proxy requirements."

Of course, the "anomaly" argument does not apply to the defendant individual directors. Damages recovered against these defendants would not affect Nicholson shareholders.

As to the argument that plaintiff has not sufficiently alleged causation in that Porter has not alleged reliance on the misrepresentation, the complaint shows otherwise. It is clearly pleaded in the complaint that the misrepresentations and fraud operated to induce Nicholson's shareholders not to tender. Complaint, paragraphs 16 and 18. Assuming arguendo that reliance must be shown in actions under Section 14(e) as under Rule 10b–5, I find no need for a showing of reliance on the part of the tender offeror here, where "no volitional act" is required. Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967), cert. den. 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Crane, supra,* 419 F.2d at 797.

Damages are, of course, recoverable only to the extent they can be proved. Mills v. Electric Auto-Lite, 396 U.S. at 388–389, 90 S.Ct. 616. Taking the allegations of the complaint as true, as I must for purposes of a motion to dismiss, I cannot say that plaintiff has suffered no damages as a result of the violations of Section 14(e). Both plaintiff and defendants have focused on the value of the control plaintiff would have had if the tender offer had been successful. Without now ruling in any way on what might be the appropriate measure of damages, the Court can conceive of alternate measures, e. g. damages measured by the premium paid on those shares purchased when control was not actually achieved, or damages measured by part or all of the administrative costs of the unsuccessful tender offer.

The defendants' motion to dismiss is denied.

## SUPPLEMENTAL OPINION

On November 30, 1972, this Court entered an opinion denying defendants' motion to dismiss this action. The motion to dismiss, inter alia, alleged that plaintiff had failed to state a cause of action under either Section 10 or Section 14(e) of the Securities Exchange Act of 1934. This Court found that a cause of action had been stated under Section 14(e) and pretermitted the Section 10 question because Section 14(e) "provides no lesser relief than would be available under Section 10b." By ex parte motion the defendants ask this Court to make a ruling on the Section 10 question. This request is also sup-

**166**

ported by plaintiff's memorandum of law.

Defendants have argued that Porter is not a purchaser or seller of the securities involved with the alleged fraud, and so, under the doctrines of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert. den. 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and Iroquois Industries v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. den. 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed. 2d 561 (1970), Porter lacks standing to bring an action under Section 10 and Rule 10b–5. Plaintiff argues that these decisions have been implicitly overruled in tender offer situations by a subsequent Second Circuit opinion, *Crane*, infra.

While this Court does not read the case of Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969), cert. den. 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970) to be a "forced seller" case as defendants urge, and while this Court feels that *Crane* reached the right result, the Court also recognizes that subsequent decisions have sought to limit *Crane* and have reaffirmed *Iroquois*. See, e. g. Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339 (9th Cir. 1972); Levine v. Sellon, Inc., 439 F.2d 328 (2d Cir. 1971).

 Defendants also seem to argue that plaintiff lacks constitutional standing, under the reasoning of Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970). While the requirements of standing under the *Birnbaum* doctrine and the requirements of standing under the Constitution may frequently coincide in particular cases, they are by no means coextensive, in this Court's opinion. The Court has no doubt that plaintiff has standing in the constitutional sense.

 Nonetheless, the action under Section 10 is dismissed under the compulsion of precedent, that is, the *Iroquois* case.