**Edgar H. BATTLE, d/b/a Edgar H. Battle Funeral Home, et al., Plaintiffs-Appellants-Cross-Appellees,**

**v.**

**LIBERTY NATIONAL LIFE INSURANCE COMPANY et al., Defendants-Appellants, Cross-Appellees,**

**No. 72-3673.**

United States Court of Appeals, Fifth Circuit.

April 25, 1974.

---

George R. Stuart, III, Edward L. Hardin, Jr., Claude McCain Moncus, Birmingham, Ala., C. Neal Pope, Phenix City, Ala., for plaintiffs-appellants.

Ira L. Burleson, Ralph B. Tate, Birmingham, Ala., for defendants-appellees.

Before WISDOM and INGRAHAM, Circuit Judges, and CHRISTENBERRY, District Judge.

INGRAHAM, Circuit Judge:

The plaintiffs in this class action are funeral homes and directors of funeral homes who allege that the defendants, Liberty National Life Insurance Company and Brown-Service Funeral Homes Company, Inc., are liable to them for violating the anti-trust laws, particularly §§ 1[1] and 2[2] of the Sherman Act and § 3[3] of the Clayton Act. The district

---

1. 15 U.S.C. § 1 (1970). The statute provides:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisoment not exceeding one year, or by both said punishments, in the discretion of the court.

2. 15 U.S.C. § 2(1970). Section 2 of the Sherman Act provides:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

3. 15 U.S.C. § 14 (1970). Section 3 of the Clayton Act provides:
It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understand-

court granted defendants' motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Because we believe the district court had insufficient facts upon which to conclude that the complaint failed to state a claim, we reverse and remand for factual development.

The relationships among the parties to this action can be briefly described as follows. Defendant Liberty National Insurance Company issues several different types of insurance, including burial insurance coverage of various policy values. Burial insurance apparently is much desired because, as alleged in the complaint, about 70% of all white persons who died in Alabama in 1970 had coverage under Liberty National's policies. About 50% of all persons, without regard to race, who died that year had such coverage with Liberty National. Currently, Liberty National has 2,800,000 outstanding, valid insurance contracts for the provision of funeral services and merchandise.

Defendant Brown-Service Funeral Homes Company, Inc., a separate corporate entity and wholly owned subsidiary of Liberty National, has contracted with Liberty National to furnish the merchandise and services required by the burial insurance policies issued by Liberty National. In addition to Liberty's paying Brown-Service large sums of money for furnishing these services, Liberty has made at least one large loan to its subsidiary, purportedly for the acquisition of buildings for funeral homes.

Brown-Service in turn has entered into contractual arrangements with many independent funeral homes and directors located in Alabama, ostensibly to perform its obligations under the contract with Liberty National. When the funeral home director signs a contract with Brown-Service, his funeral home becomes an "authorized" home for servicing and furnishing merchandise to Liberty National burial insurance policyholders. Those, of course, who do not sign a contract are considered "unauthorized" homes. The named plaintiffs in this case consist of five authorized and five unauthorized funeral homes and directors. Importantly, the services provided under the policy differ significantly, depending on whether an insured uses an authorized or unauthorized funeral home for performance of the contract. If the insured goes to an authorized home, he is entitled to a casket, burial clothing, embalming, use of the funeral parlor, assistance in the performance of any services, transportation to the cemetery or church, and rail transportation to any place within the continental United States. But if a policyholder takes his business to an unauthorized funeral home, the benefits conferred under the policy include only a casket or, depending on the policy, a cash settlement.

The district court, without supporting analysis, granted the motion to dismiss for essentially three reasons. First, the court held that the plaintiffs have no standing to assert a private cause of action seeking treble damages under § 4 of the Clayton Act.[4] Second, a consent decree entered into between the United States and Liberty National in 1954 was thought to immunize the defendants from suits asserting violations of the anti-trust laws. Third, the court reasoned that the McCarran-Ferguson Act,[5] while it did not exempt Brown-

ing that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding, may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

4. 15 U.S.C. § 15 (1970).

5. 15 U.S.C. § 1012(b) (1970).
 (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That

Service, exempted Liberty National from liability under the anti-trust laws. At this stage of the proceedings, we cannot agree with the district court's conclusions or with the defendants' additional contentions raised on appeal.

## I.

At the outset, it is important to note that the scope of appellate review of a motion to dismiss for failure to state a claim is narrow. For the motion to have been properly granted, it must be plain that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45, 78 S. Ct. 99, 102, 2 L.Ed.2d 80 (1957); Sarter v. Mays, 491 F.2d 675 (5th Cir., 1974); Brett v. First Federal Sav. & Loan Ass'n, 461 F.2d 1155, 1157 (5th Cir., 1972); see Dailey v. Quality School Plan, Inc., 380 F.2d 484, 486 (5th Cir., 1967). "[A]ll the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, supra, 355 U.S. at 47. The facts as alleged in the complaint must be presumed to be true, Brett v. First Federal Sav. & Loan Ass'n, supra, 461 F.2d at 1157, and only when "some insuperable bar to relief" is obvious from the face of the complaint is dismissal proper. C. Wright, Law of Federal Courts, § 68, at 285 (1970).

With these principles in mind, we turn to the issue whether the complaint sufficiently stated a claim for relief. In an organized fashion the complaint sets forth three bases for relief. The plaintiffs first alleged that "the defendants have engaged in an unlawful combination and conspiracy in unreasonable restraint of . . . interstate trade and commerce," violating § 1 of

the Sherman Act. 15 U.S.C. § 1. It is well established that a corporation can combine and conspire with its wholly owned subsidiary in violation of § 1 of the Sherman Act. E. g. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 205 (5th Cir., 1969). Defendants argue, however, that because Liberty National and Brown-Service are one organization or business unit and not competitors, they are unable to form a combination or conspiracy within the meaning of § 1. We cannot agree.

Even though Liberty National and Brown-Service are not competitors, because Liberty National is in the insurance business while Brown-Service provides funeral services and merchandise, the alleged facts tend to establish that they are operationally two separate organizations entirely capable of combining or conspiring to restrain trade. That the defendants do not compete with each other in no way precludes them from combining or conspiring to suppress competition, the ultimate result of which would inure to their mutual benefit. While the existence of competition between two organizations would tend to establish their separateness and thus fulfill the requirement that it takes more than one party to create a combination or conspiracy, the absence of such competition does not preclude the existence of two separate organizations. See Beckman v. Walter Kidde & Co., 316 F.Supp. 1321 (E.D.N.Y., 1970), aff'd, 451 F.2d 593 (2nd Cir., 1970).

Additionally, the plaintiffs' factual averments, if established, would tend to support a finding of unreasonable restraint of trade. It appears that, since the insurance contract confers far more benefits upon the policyholder if he uses an authorized funeral home rather than

---

after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal

Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

an unauthorized home, the policyholder is subtly coerced into dealing only with the authorized home. The imposition of this restraint would effectively foreclose the unauthorized funeral director's access to a substantial portion of the market. These facts sufficiently apprise the defendants of the nature of plaintiffs' claims, might furnish a basis for relief under § 1 of the Act, and are certainly sufficient to withstand a motion to dismiss for failure to state a claim.

The second basis for relief set out in the complaint is that defendants "unlawfully did monopolize, attempt to monopolize, and did combine and conspire . . . to monopolize a part of the trade and commerce in furnishing funeral services and selling funeral supplies . . . in violation of § 2 of the Sherman Act . . . ." 15 U.S.C. § 2. The Supreme Court in United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), outlined two essential criteria for determining when § 2 has been violated as follows: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 570–571; *see* Woods Exploration & Prod. Co., Inc. v. Aluminum Co. of America, 438 F.2d 1286, 1304 (5th Cir., 1971).[6]

Measured against these criteria, a claim for relief under § 2 is adequately stated to resist defendants' motion to dismiss. With regard to the possession of monopoly power, frequently defined as "the power to [raise] prices or exclude competition," United States v. E. I. DuPont deNemours & Co., 351 U.S. 377, 391–392, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956), the complaint alleges that Brown-Service currently maintains contractual relationships with one hundred

and ninety-two of a total of two hundred and twenty-four funeral homes in Alabama. Of the funeral homes catering particularly to the white community, only seven homes have managed to fend off the control of Brown-Service. All seven of these homes, six of which are controlled by one man, sell their own burial insurance. Of the one hundred and ten homes catering primarily to the black community, only twenty-five have escaped Brown-Service's domination. Moreover, thousands of persons who die in Alabama are insured by Liberty National burial policies. Since so many persons are insured under Liberty National's policies, and the beneficiaries of these policies obviously would be inclined to use the authorized funeral home because of the far greater benefits conferred under the policy, the unauthorized funeral home is effectively foreclosed from attracting any business from this portion of the funeral market. At Liberty National's instigation and with Brown-Service's assistance, the collective activities of the defendants have resulted in control over a substantial portion of the market in funerals. And it appears true, as the plaintiffs contend, that if a person wanted to enter the funeral business in Alabama, he would have to either sign a contract with Brown-Service or automatically relinquish the opportunity to attract business from this portion of the market. In short, such quantitative dominance tends to establish, at least to withstand a motion to dismiss, the likelihood that defendants could exclude competition and thus possess monopoly power.

As to delineating the relevant market, a cursory reading of the complaint discloses the economic and geographic area of activity in which the defendants conduct their business. Of course, the relevant market may be as large as our nation or as small as a particular community.[7] But it is plain that

6. For a helpful summary of anti-trust law, *see* Comment, A Survey of Anti-Trust Law in the Fifth Circuit, 11 Houston L.Rev. (1974).

7. *Id.* Nothing we say here would preclude the district court, upon factual development, from concluding that the relevant market is something larger or smaller than the territorial boundaries of the State of Alabama.

the defendants' activities, the sale of burial insurance and the performance of their obligations under these policies, basically are within the geographic confines of the State of Alabama. Although there might be some limited excursions outside the territorial boundaries of the state in performing the obligations under the insurance contracts, the perimeters of the "exact spot" of a relevant market need not be outlined. It is enough to show a relevant area in which the defendants might exclude competition. *See* United States v. Pabst Brewing Co., 384 U.S. 546, 549–550, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966). So far as a motion to dismiss is concerned, the complaint indicates the relevant market.

The willful acquisition or deliberateness in gaining such power also is sufficiently covered by the complaint. The contract between Brown-Service and independent funeral homes prohibits such an authorized funeral home from selling any other type of burial insurance, including its own. Additionally, if after the funeral director enters into such a contract he decides that he no longer wants to be bound, the plaintiffs allege that Brown-Service has threatened to construct an authorized funeral home in the vicinity and thereby detract from the present funeral director's business. This threat plainly would coerce the funeral director to refrain from terminating the contract, thus relinquishing the opportunity to sell any other brand of insurance.

Moreover, the contract provides that, when the funeral director provides services under the policy, Brown-Service pays to the director a specified amount depending on the value of the policy. For example, if the policy value is $300, the director receives $90; if the policy value is $600, the director receives $180. Incredibly, however, if an unauthorized home performs the services required by the policy, it receives nothing from Brown-Service. Instead, the authorized home in that area will receive the specified amount even though it has performed no services. In view of Liberty National's preeminent position in the burial insurance market, this suppression of competition in a large sector of that market sufficiently alleges the deliberateness, as against a motion to dismiss, required to establish a violation of § 2 of the Sherman Act.

Third, plaintiffs allege that defendants have violated the price-fixing prohibition of § 3 of the Clayton Act, because defendants have maintained prices for merchandise required to be furnished under insurance contracts from which the plaintiffs may not deviate. While plaintiffs assert that defendants have fixed prices for various services performed by the funeral homes, price-fixing under § 3 is limited by the statute's language to transactions dealing in "goods, wares, merchandise, machinery, supplies, or other commodities" [8] and therefore does not apply to services. The price-fixing of services would be covered by § 1 of the Sherman Act. But the plaintiffs also allege price-fixing with regard to merchandise. For example, they assert that their contracts with Brown-Service set forth the prices for particular funerals and vaults, that such prices are predetermined by the defendants and that the contract prohibits giving any discounts. Additionally, in an instance designated in the contract when Brown-Service does not provide a casket, such as when the deceased is under four weeks old and both parents have valid Liberty National policies, the funeral home is required to

---

8. 15 U.S.C. § 14; *see* Comment, A Survey of Anti-Trust Law in the Fifth Circuit, 11 Houston L.Rev. (1974). The allegations of price-fixing concerning services suffer from the same conceptual difficulty as those concerning price fixing of merchandise. The funeral directors do not appear to be selling the services to the policyholder but only performing them and receiving the designated remittance from Liberty National. Because of the liberal rules governing pleading, the plaintiffs will have the opportunity to clarify these allegations on remand.

furnish a casket not to exceed $15 in cost. It is also alleged in the complaint that Liberty National has purchased at least one other insurance company and that authorized homes must provide funeral merchandise as required under the policies issued by that company. It is asserted that such merchandise is furnished by authorized dealers at prices set by the defendants.

The problem with these factual assertions is that conceptually they do not fit the normal price-fixing pattern. When the funeral home director provides the specified merchandise, he does not charge the customer any price, nor does the policyholder remit any payment to the funeral director. Instead, when the funeral home provides its merchandise as required by the contract with Brown-Service, Brown-Service pays the funeral home a specific amount depending on the value of the particular policy.

While these facts are insufficient to establish a claim for price-fixing, the complaint as a whole discloses a state of facts that conceivably could support price-fixing, or even another violation under § 3 such as tying arrangements or exclusive dealing contracts. We therefore leave this question open for the district court to consider on development of the facts.

We can only reiterate that a plaintiff does not have to completely establish his cause of action in the complaint. As noted earlier, the complaint in complex anti-trust litigation must plainly set forth its claim for relief in order to apprise the defendant of the nature of the claim. C. Wright, Law of Federal Courts, § 1228, at 167 (1969). The plaintiffs in the case at hand set forth three separate claims that they believed entitled them to relief, and it does not appear that there is no state of facts they could prove to recover. If any additional information is needed, defendants can resort to such methods of disclosure as discovery or a motion for a more definite statement. The complaint is sufficient to withstand defendants' motion to dismiss.

## II.

Having concluded that the complaint sufficiently sets forth a cause of action, we must now decide whether there is "some insuperable bar to relief" which justified the district court's dismissal. C. Wright, Law of Federal Courts, § 68, at 285 (1970). Initially, we confirm the district court's judgment that it had subject matter jurisdiction under §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act. With respect to the Sherman Act, jurisdiction is established either by the proscribed activities actually being in interstate commerce, or the activities, when considered in the aggregate, have a substantial effect on interstate commerce. Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 234, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); Doctors, Inc. v. Blue Cross, 490 F.2d 48, 50 (3rd Cir., 1973); Lehrman v. Gulf Oil Corp., 464 F.2d 26, 37 (5th Cir., 1972). Even if the proscribed activity is purely intrastate in character, such activity falls within the jurisdictional scope of the Sherman Act when there is a substantial impact on interstate commerce.

Because the facts are not fully developed, subject-matter jurisdiction under §§ 1 and 2 cannot be conclusively determined at this stage of the proceedings. The plaintiffs, however, aver facts that, if established, would support jurisdiction under either test. Among other factual averments, the complaint states that the defendants' activities have occurred in interstate commerce because they received funeral items, such as caskets, that are shipped in interstate commerce, that the caskets are delivered to authorized funeral homes, and that they are used in performing the insurance contracts. Plaintiffs allege that they provide funeral merchandise and services under Liberty National's insurance policies for persons outside the State of Alabama, in the adjacent states, who live, or rather die, in close proximity to an authorized funeral home. Additionally, the plaintiffs allege that they received other funeral merchandise, such

as burial clothing, embalming fluids, and other essentials, from outside state manufacturers and used this merchandise in performing their obligations under their contracts with Brown-Service. These averments at least allege a sufficient connection with interstate commerce to bring the plaintiffs within the jurisdictional scope of §§ 1 and 2 of the Sherman Act.

Even if the plaintiffs were unable to show that the proscribed activities were actually in interstate commerce, the complaint alleges sufficient facts, that if established, would support jurisdiction as having a substantial effect on commerce. The funeral insurance business and operation of funeral homes pervades the economic atmosphere in Alabama. As noted previously, almost all of the funeral homes in Alabama have entered into contract with Brown-Service for furnishing services and merchandise, and a large percentage of persons who die in the state have burial insurance contracts with Liberty National. If these facts are established, it appears that such activities, when considered in the aggregate, would have a substantial impact on interstate commerce, and thus satisfy the jurisdictional requirement under the Sherman Act.

■■■■ With respect to jurisdiction under the Clayton Act, it is normally recognized that the jurisdictional basis is somewhat narrower than that of the Sherman Act. *See* Littlejohn v. Shell Oil Co., 483 F.2d 1140, 1144 (5th Cir., 1973); Lehrman v. Gulf Oil Corp., *supra*, 464 F.2d at 36–37; Cliff Food Stores, Inc. v. Kroger, Inc., *supra*, 417 F.2d at 208–209. In accordance with the terms of the statute, some aspect of the prohibited conduct must occur "in commerce" or "in the course of such commerce," the effect of which is to "substantially lessen competition or tend

to create a monopoly in any line of commerce." 15 U.S.C. § 14.

As noted earlier, the factual allegations of price-fixing contained in the complaint do not fit the normal conceptual pattern for price-fixing. The complaint as a whole, however, reveals the possibility that plaintiffs could allege a state of facts to support recovery under § 3. Ultimately, the question of whether there is jurisdiction under § 3 is for the district court upon remand with the benefit of counsels' rearticulation of the claim.

■■■■ The defendants argue that the trial court properly granted their motion to dismiss because the plaintiffs have no standing to assert the alleged anti-trust violations. Section 4 of the Clayton Act authorizes a private plaintiff to sue for injuries sustained as a consequence of an anti-trust violation.[9] By the terms of § 4, two criteria must be satisfied before standing is established. In re Multidistrict Vehicle Air Pollution MDL No. 31, 481 F.2d 122, 126 (9th Cir., 1973); *see* Dailey v. Quality School Plan, Inc., *supra*, 380 F.2d at 487. First, the plaintiffs must show that they have suffered injury to "business or property," recently defined as referring to "commercial interests or enterprises." Hawaii v. Standard Oil Co., 405 U.S. 251, 264, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). The complaint plainly alleges that the commercial enterprise involved in the case at hand is the business of providing funeral services and merchandise, and such is sufficient to satisfy this requirement.

To satisfy the second criteria for establishing standing, plaintiffs must show that their injuries were incurred "by reason of" the defendants' illegal activities. As recently noted by the Supreme Court, the courts of appeals have imposed limitations on this aspect of the standing test, "concluding that Congress

---

9. 15 U.S.C. § 14 (1970).

Any person who shall be injured in his *business or property by reason of* anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. (Emphasis added)

did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Hawaii v. Standard Oil Co., *supra*, at 263, n. 14. Without attempting to carefully categorize all the cases in which this problem has been presented, the courts in articulating such limitations have relied on phrases like "direct" injury, or whether the plaintiffs' business falls within the "target area" of defendants' supposedly illegal commercial activity.[10] In this circuit the limitation of this principle has been stated as requiring the plaintiff to show that he is "within the sector of the economy in which the violation threatened a breakdown of competitive conditions and that he was proximately injured thereby . . . ." Dailey v. Quality School Plan, Inc., *supra*, 380 F. 2d at 487, quoting South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir., 1966). The allegations in the complaint tend to bring the plaintiffs within that economic section where competition is restrained or otherwise suppressed. Collectively, Liberty National and Brown-Service are in effect directly competing with the plaintiffs in the sale to the public of funeral merchandise and services. The defendants' sale of such services and merchandise under the insurance contract practically forecloses that portion of the market to both the authorized and unauthorized funeral homes.

■ Third, defendants contend that they are exempted from application of the anti-trust laws by the provisions of the McCarran-Ferguson Act. Congressional enactment of the McCarran Act created an exemption from the anti-trust laws for activity constituting "the business of insurance to the extent that such business is not regulated by State law." 15 U.S.C. § 1012(b). To determine the applicability of this exemption, it first must be decided what activity constitutes the "business of insurance" within the meaning of the Act.

The Supreme Court in SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), articulated the standard for deciding what activity is the business of insurance under the McCarran Act:

". . . The statute did not purport to make the States supreme in regulating all the activities of insurance *companies*; its language refers not to the persons or companies who are subject to state regulation, but to laws 'regulating the *business* of insurance.' Insurance companies may do many things which are subject to paramount federal regulation . . . . The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder."

*Id.* at 459–460.

Recognizing this standard, the Third Circuit recently held in Travelers Ins. Co. v. Blue Cross, 481 F.2d 80, 82 (3rd Cir., 1973), that a contractual arrangement consummated between an insurance company, Blue Cross, and various hospitals for the furnishing of services under insurance policies constituted the business of insurance, and thus the relationship fell within the McCarran exemption. The contract required the hospitals to furnish services to an insured, and the cost to Blue Cross would be only the cost to the hospital, not to exceed a

---

10. In In re Multidistrict Vehicle Air Pollution MDL No. 31, 481 F.2d 122 (9th Cir., 1973), Judge Ely analyzes and attempts to categorize the various limitations employed by the courts of appeals. *Id.* at 127, note 7. Judge Ely notes that the test in the Fifth Circuit more closely approximates the "target area" criterion.

designated ceiling. Significantly, the relationship between the insurance company and the hospitals in *Blue Cross* was a direct contractual relationship. The result of this contract was simply the performance of the insurer's responsibilities owed to the insured under the insurance contract and nothing more.[11]

While the facts in the case at hand are inadequately developed to make a conclusive determination of this question, it might be plausibly argued that these facts do not constitute the business of insurance as contemplated by the McCarran Act, and thus do not fall within its exemption. The contractual relationship maintained in the instant case is not a direct relationship between the insurance company, Liberty National, and the funeral directors. Instead, Liberty National has entered into a contract with Brown-Service, a separate entity conducting a separate function, and Brown-Service in turn contracts with the individual funeral directors. In attempting to acquire merchandise and services necessary to fulfill its obligations under its policies, Liberty National has created an arrangement with an additional party that has nothing to do with issuing insurance.

The addition of this intermediary is significant because, under the guise and with the assistance of Brown-Service, Liberty National may have exceeded the business of providing burial insurance and encroached upon the business of providing funeral services. In *Blue Cross* the agreement between the insurance company and the hospitals only required the performance of obligations owed to the insured by the insurer under the insurance contract. This plainly relates to the "relationship between the insurance company and the policyholder." SEC v. National Securities, Inc., *supra*. But in the instant case based on the facts alleged in the complaint, it appears that the contractual arrangement between Brown-Service and the authorized funeral directors requires more than just performance of the obligations owed by the insurance company to the insured. Rather the arrangement requires the performance of duties beyond those encompassed by the business of insurance, duties that relate solely to the plaintiffs' businesses in the operation of their funeral homes, and thus the defendants' activities fall outside the McCarran Act exemption. For example, the standard contract between Brown-Service and the funeral directors requires the director to use caskets furnished by Brown-Service when providing services under a policy, to display in the home such merchandise, and prohibits the sale of Brown-Service merchandise to other customers. The director is required to post in noticeable places his prices for funerals and vaults, and he is required to adhere to these quotations without giving discounts to an insured of any particular company. And the funeral home and equipment must be maintained to meet certain standards, as stated by Brown-Service, and is subject to inspection by Brown-Service to insure compliance. While all these obligations are related to the business of insurance, we believe that they are so remotely related as to be subject to the antitrust laws. Such obligations may go beyond the business of insurance as intended by the McCarran Act and encroach on the business of providing funeral merchandise and services.

Apart from the contractual impositions pertaining more readily to the op-

11. The only case we have been able to uncover that is similar to the instant case is Holly Springs Funeral Home v. United Funeral Service, 303 F.Supp. 128 (N.D.Miss., 1969). In *Holly Springs* the plaintiffs claimed that the defendant's sale of burial insurance policies violated §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act. *Holly Springs* is not controlling here because, as the court pointed out, the restrictions with whom the policyholder could deal were set forth only in the insurance policy. "A funeral home . . . has no contractual obligation with anyone; . . . ." But the funeral homes in the instant case are bound by contracts with Brown-Service to perform services and furnish merchandise.

eration of plaintiffs' undertaking businesses than to the insurance business, it is alleged that Liberty National has engaged in additional conduct that falls outside the ambit of the business of insurance. For example, according to the complaint, Liberty National owns buildings and leases them at favorable rates to persons who agree to become authorized funeral directors. The complaint also asserts that Liberty National lends money to authorized directors, and only authorized directors, presumably for the operation of the funeral homes. The validity of such averments must be decided before conclusively determining that defendants are engaged solely in the business of insurance as contemplated by the McCarran Act.

Even assuming that defendants are engaged in the business of insurance and that it is regulated by state law,[12] this exemption is eviscerated by any boycott, coercion or intimidation on behalf of the defendants.[13] The complaint specifically alleges that the defendants have engaged in such activities. Among other averments, plaintiffs set out in the complaint that, if an authorized funeral director in a particular area decides to cancel his contract with Brown-Service, the defendants have threatened to build a competing funeral home in the same locality. Liberty National, it is asserted in the complaint, has threatened to cancel contracts of those who oppose its activities. Moreover, the plaintiffs allege acts of physical violence in Liberty National's asserted attempt to monopolize the industry. Without a hearing to establish the validity of such contentions, the district court could not accurately determine the applicability of this limitation of the McCarran Act.

Finally, plaintiffs argue that the trial court incorrectly granted the motion to dismiss based on a consent decree entered into between the defendants and the United States in 1954. This is true, plaintiffs argue, because they have alleged facts demonstrating that defendants have violated the terms of the decree. But even if the defendants have fully complied with the decree, plaintiffs say that they may challenge alleged activity that falls both outside and inside the terms of the decree.

 The mere existence of the consent decree, of course, will not immunize the defendants from all anti-trust violations. If defendants have violated the terms of the decree, they should be held in contempt and enjoined from further violations.[14] Significantly, while defendants may have complied with the specific language of the decree, their activities may circumvent its underlying intent and thus violate the anti-trust laws. There are facts alleged in the complaint that indicate the defendants have not fully complied with the meaning and spirit of the decree. The district court could not accurately determine whether the decree constitutes an insurmountable obstacle to relief until it determined the validity of these averments.

12. In determining whether there is state regulation of the insurance business, the courts have adopted varying points of view. In Ohio AFL–CIO v. Insurance Rating Board, 451 F.2d 1178 (6th Cir., 1971), cert. den., 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972), the court stated that the requirement of state regulation under the McCarran Act is satisfied if the state has " 'generally authorized or permitted certain standards of conduct.' " *Id.* at 1182. The regulatory scheme was considered sufficient even though it may not have been enforced. In Travelers Ins. Co. v. Blue Cross, 481 F.2d 80 (1973), the court recognized the test set forth in the insurance rating case, but then found that the state regulation was more "aggressive" and encompassing. Because we disagree with the district court

for other reasons specified above, we need not determine either the standard or the extent of insurance regulation in Alabama at this time.

13. 15 U.S.C. § 1013(b) (1970). This provision provides:

(b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

14. Unless the private plaintiffs, in the court's discretion, intervened in the prior suit, it appears that the proper party to bring a contempt proceeding for violation of the 1954 decree is the United States. *See* United States v. Borden, 347 U.S. 514, 519, 74 S.Ct. 703, 98 L.Ed. 903 (1954).

Likewise, our conclusion is the same with regard to alleged illegal conduct that falls outside the scope of the decree. The consent decree is a narrowly drawn instrument that delineates conduct in which the defendants must and must not engage. The existence of such a narrow instrument cannot immunize the defendants from anti-trust violations that were not contemplated and specified in the decree. Even assuming that the defendants have complied with the specific narrow terms of the decree, the plaintiffs allege illegal conduct that, if established at a hearing or trial, constitutes a violation of the anti-trust laws apart from the activities delineated in the decree. Conceivably, plaintiffs could prove a state of facts to support recovery that were not encompassed by the terms of the decree, and therefore the district court's granting a motion to dismiss was improper.

The plaintiffs argue that, even though the defendants might have complied with the decree's terms, they may now complain of the same conduct prohibited in the decree because they were not a party to what transpired in 1954, and consequently are not bound by it. The defendants respond by arguing that this suit alleges claims that basically are the same as those alleged by the government in 1954, that the consent decree resolved the same claims, and that they have complied and relied on the terms of the decree. As a consequence of this prior adjudication, defendants contend that plaintiffs cannot now complain of the same conduct, and thus the decree constitutes a bar to this suit. We cannot agree.

 It is well established that both a private plaintiff and a public plaintiff have a cause of action against a violator of the anti-trust laws. Each of these remedies is based upon different policy considerations, are considered cumulative, and may be pursued in complete disregard of the other. United States v. Borden Co., 347 U.S. 514, 518–519, 74 S.Ct. 703, 98 L.Ed. 903 (1954). The government is authorized to bring an action for the protection of the public's in-terest, and the private plaintiff is authorized to sue for specific injury he has sustained and injunctive relief to prevent further injury. Id. at 518. As the government may obtain an injunction in the public's interest, even after the private plaintiff has settled his claim, likewise the private plaintiff's action is not precluded by the government's separate suit pursuing relief. Sam Fox Publishing Co. v. United States, 366 U.S. 683, 690, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961). Indeed, to avoid amplifying the inherent complexity and confusion in anti-trust litigation, the courts have generally refused to allow a private plaintiff intervention to press his claim in a suit brought by the government. See Partmar Corp. v. United States, 338 U.S. 804, 70 S.Ct. 69, 94 L.Ed. 486 (1949); Allen Calculators Inc. v. National Cash Register Co., 322 U.S. 137, 64 S.Ct. 905, 88 L.Ed. 1188 (1944).

 Even though the allegations in the complaint in the case at hand may be similar to those in the 1954 case, this alone does not automatically preclude this cause of action. If plaintiffs would have brought this suit within four years after the government filed its claim in 1954, the complaint would have alleged a cause of action regardless of the similarity of the claims. The public and private causes of action are independent. Now that the four year statute of limitations has run, it appears that plaintiffs could not recover for damages sustained prior to 1954 because the government's initiation of a suit starts the period of limitations running. Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965). But, as alleged in the complaint, when the defendant fraudulently conceals an anti-trust violation, the period of limitations does not begin to run until the violation is discovered or should have been discovered. General Electric Co. v. City of San Antonio, 334 F.2d 480 (5th Cir., 1964); Kansas City v. Federal Pacific Electric Co., 310 F.2d 271 (8th Cir., 1962). It appears that the district court on remand will need to deter-

mine whether there was such fraudulent concealment of the facts to prevent the statute of limitations from running.

 Because the terms of consent decrees are precipitated through negotiation and compromise, it also is conceivable that the decree itself could authorize conduct that otherwise would violate the anti-trust laws, if not at the conception of the decree, through a subsequent change in circumstances. And assuming, without deciding, that damages for past injuries sustained as a result of such a decree are not recoverable, we are not persuaded that plaintiffs would not be entitled to prospective injunctive relief. While the government's consent decree entered into in 1954 may have proscribed particular conduct and satisfied the public's interest, it may not have gone far enough to prevent further injury to the private plaintiffs.

In any event, the alleged facts of this case are not fully developed and, therefore, we cannot make a conclusive determination on any of these questions. Because it appears that plaintiffs could possibly prove a state of facts upon which they could recover, we reverse and remand for proceedings not inconsistent with this opinion.