## SECURITIES AND EXCHANGE COMMISSION *v.* NATIONAL SECURITIES, INC., ET AL.

No. 41.   Argued November 18–19, 1968.—Decided January 27, 1969.

*Solicitor General Griswold* argued the cause for petitioner. With him on the briefs were *Lawrence G. Wallace, Philip A. Loomis, Jr., David Ferber, Edward B. Wagner,* and *Frank N. Fleischer.*

*John P. Frank* argued the cause for respondents. With him on the brief was *A. Gordon Olsen.*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This case raises some complex questions about the Securities and Exchange Commission's power to regulate

the activities of insurance companies and of persons engaged in the insurance business. The Commission originally brought suit in the United States District Court for the District of Arizona, pursuant to § 21 (e) of the Securities Exchange Act of 1934, 48 Stat. 900, as amended, 15 U. S. C. § 78u (e). It alleged violations of § 10 (b) of the Act, 48 Stat. 891, 15 U. S. C. § 78j (b), and of the Commission's Rule 10b–5, 17 CFR § 240.10b–5 (1968). According to the amended complaint, National Securities and various persons associated with it had contrived a fraudulent scheme centering on a contemplated merger between National Life & Casualty Insurance Co. (National Life), a firm controlled by National Securities, and Producers Life Insurance Co. (Producers). The details of the alleged scheme are not important here. The Commission contended that National Securities purchased a controlling interest in Producers, partly from Producers' directors and partly in the form of treasury stock held by Producers. After taking control of Producers' board, respondents sought to obtain shareholder approval of the merger by sending communications to Producers' 14,000 stockholders. These communications, according to the Commission, contained misrepresentations of material facts and omitted to state material facts necessary to make the statements which were made not misleading. Among other things, respondents allegedly failed to disclose their plan for the surviving company to assume certain obligations which National Securities had undertaken as part of the consideration for its purchases of Producers' stock. In plain language, Producers' shareholders were not told that they were going to pay part of the cost of National Securities' acquisition of control in their company.

The Commission was denied temporary relief, and shortly thereafter Producers' shareholders and the Arizona Director of Insurance approved the merger. The

two companies were formally consolidated into National Producers Life Insurance Co. on July 9, 1965. Thereafter, the Commission amended its complaint to seek additional relief; the previously sought injunction forbidding further violations of Rule 10b–5 was to be supplemented by court orders unwinding the merger and returning the situation to the *status quo ante*, requiring respondents to make an accounting of their unlawful gains, and readjusting the equities of the various respondents in whatever companies survived the decree. The Commission also requested whatever further relief the court might deem just, equitable, and necessary. Respondents moved for judgment on the pleadings, and the trial court dismissed the complaint for failure to state a claim upon which relief could be granted. The court ruled that the relief requested was either barred by §2 (b) of the McCarran-Ferguson Act, 59 Stat. 34 (1945), as amended, 15 U. S. C. § 1012 (b),[1] or was beyond the scope of § 21 (e) of the Securities Exchange Act. 252 F. Supp. 623 (1966). The Ninth Circuit affirmed, relying on the McCarran-Ferguson Act. 387 F. 2d 25 (1967). Upon application by the Commission, we granted certiorari because of the importance of the questions raised to the administration of the securities laws. 390 U. S. 1023 (1968).

---

[1] "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law."

## I.

Insofar as it is relevant to this case, § 2 (b) of the McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . ." Respondents contend that this Act bars the present suit since the Arizona Director of Insurance found that the merger was not "[i]nequitable to the stockholders of any domestic insurer" and not otherwise "contrary to law," as he was required to do under the state insurance laws. Ariz. Rev. Stat. Ann. § 20–731 (Supp. 1969). If the Securities Exchange Act were applied, respondents argue, these laws would be "superseded." The SEC sees no conflict between state and federal law; it contends that the applicable Arizona statutes did not give the State Insurance Director the power to determine whether respondents had made full disclosure in connection with the solicitation of proxies.[2] Although respondents disagree, we do not find it necessary to inquire into this state-law dispute. The first question posed by this case is whether the relevant Arizona statute is a "law enacted . . . for the purpose of regulating the business of insurance" within the meaning of the McCarran-Ferguson Act. Even accepting respondents' view of Arizona law, we do not believe that a state statute aimed at protecting the interests of those who own stock in insurance companies comes within the sweep of the McCarran-Ferguson Act. Such a statute is not a state attempt to regulate "the business of insurance," as that phrase was used in the Act.

---

[2] In 1966 Arizona law was amended to give him this power. See Ariz. Rev. Stat. Ann. § 20–143 (Supp. 1969). This statute was passed in response to the 1964 amendments to the Securities Exchange Act. Pub. L. 88–467, 78 Stat. 565.

The McCarran-Ferguson Act was passed in reaction to this Court's decision in *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533 (1944). Prior to that decision, it had been assumed, in the language of the leading case, that "[i]ssuing a policy of insurance is not a transaction of commerce." *Paul* v. *Virginia,* 8 Wall. 168, 183 (1869). Consequently, regulation of insurance transactions was thought to rest exclusively with the States. In *South-Eastern Underwriters,* this Court held that insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws, in particular, were applicable to them. Congress reacted quickly. Even before the opinion was announced, the House had passed a bill exempting the insurance industry from the antitrust laws. 90 Cong. Rec. 6565 (1944). Objection in the Senate killed the bill, 90 Cong. Rec. 8054 (1944), but Congress clearly remained concerned about the inroads the Court's decision might make on the tradition of state regulation of insurance. The McCarran-Ferguson Act was the product of this concern. Its purpose was stated quite clearly in its first section; Congress declared that "the continued regulation and taxation by the several States of the business of insurance is in the public interest." 59 Stat. 33 (1945), 15 U. S. C. § 1011. As this Court said shortly afterward, "[o]bviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408, 429 (1946).

The question here is whether state laws aimed at protecting the interests of those who own securities in insurance companies are the type of laws referred to in the 1945 enactment. The legislative history of the McCarran-Ferguson Act offers no real assistance. Congress was mainly concerned with the relationship be-

tween insurance ratemaking and the antitrust laws, and with the power of the States to tax insurance companies. See, *e. g.*, 91 Cong. Rec. 1087–1088 (remarks of Congressmen Hancock and Celler). The debates centered on these issues, and the Committee reports shed little light on the meaning of the words "business of insurance." See S. Rep. No. 20, 79th Cong., 1st Sess. (1945); H. R. Rep. No. 143, 79th Cong., 1st Sess. (1945). In context, however, it is relatively clear what problems Congress was dealing with. Under the regime of *Paul v. Virginia, supra,* States had a free hand in regulating the dealings between insurers and their policyholders. Their negotiations, and the contract which resulted, were not considered commerce and were, therefore, left to state regulation. The *South-Eastern Underwriters* decision threatened the continued supremacy of the States in this area. The McCarran-Ferguson Act was an attempt to turn back the clock, to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation. As the House Report makes clear, "[i]t [was] not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the *Southeastern Underwriters Association* case." H. R. Rep. No. 143, 79th Cong., 1st Sess., 3 (1945).

Given this history, the language of the statute takes on a different coloration. The statute did not purport to make the States supreme in regulating all the activities of insurance *companies;* its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the *business* of insurance." Insurance companies may do many things which are subject to paramount federal regulation; only when they

are engaged in the "business of insurance" does the statute apply. Certainly the fixing of rates is part of this business; that is what *South-Eastern Underwriters* was all about. The selling and advertising of policies, *FTC* v. *National Casualty Co.*, 357 U. S. 560 (1958), and the licensing of companies and their agents, cf. *Robertson* v. *California*, 328 U. S. 440 (1946), are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul* v. *Virginia* held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."

In this case, Arizona is concerning itself with a markedly different set of problems. It is attempting to regulate not the "insurance" relationship, but the relationship between a stockholder and the company in which he owns stock. This is not insurance regulation, but securities regulation. It is true that the state statute applies only to insurance companies. But mere matters of form need not detain us. The crucial point is that here the State has focused its attention on stockholder protection; it is not attempting to secure the interests of those purchasing insurance policies. Such regulation is not within the scope of the McCarran-Ferguson Act.

This reading of the Act is implicit in this Court's past decisions. Less than two years ago the Court approved the application of the registration requirements of the Securities Act of 1933, § 5, 48 Stat. 77, 15 U. S. C. § 77e, to certain annuity contracts issued by insurance companies. *SEC* v. *United Benefit Life Insurance Co.*, 387 U. S. 202 (1967). The Court explicitly rejected arguments based on the McCarran-Ferguson Act in a similar case of slightly earlier vintage. *SEC* v. *Variable Annuity Life Insurance Co.*, 359 U. S. 65, 67–68 (1959). Although the securities laws contain a number of exemptions relating to insurance and insurance companies,[3] the Commission has traditionally regulated a number of activities related to insurance securities.[4] Of course, under the securities laws state regulation may co-exist with that offered under the federal securities laws. See, *e. g.*, Securities Act of 1933, § 18, 48 Stat. 85, 15 U. S. C. § 77r; Securities Exchange Act of 1934, § 28 (a), 48 Stat. 903, 15 U. S. C. § 78bb (a). But it has never been held that state regulation of insurance securities pre-empts federal regulation, on the theory that the federal securities laws would be "superseding" state laws regulating the "business of insurance." The fact that Arizona purports to protect the interests of insurance company stockholders does not, therefore, by itself render the federal securities laws inapplicable.

## II.

The fact remains, however, that the State of Arizona has approved a merger between two insurance companies

---

[3] *E. g.*, Securities Act of 1933, § 3 (a) (8), 48 Stat. 76, 15 U. S. C. § 77c (a) (8); Securities Exchange Act of 1934, § 12 (g) (2) (G), added by Pub. L. 88–467, 78 Stat. 567 (1964), 15 U. S. C. § 78*l* (g) (2) (G).

[4] The Commision lists a large number of examples of its activities in its brief. Brief for Petitioner 16–17.

which, as a matter of remedies, the Securities and Exchange Commission seeks to unwind. Moreover, Arizona has approved the merger not only under its laws relating to insurance securities but also in its capacity as licensor of insurers within the State. The applicable statute requires the State Director of Insurance to find that the proposed merger would not "substantially reduce the security of and service to be rendered to policyholders" before he gives his approval. Ariz. Rev. Stat. Ann. § 20–731B 3 (Supp. 1969). This section of the statute clearly relates to the "business of insurance." The question is, then, whether the McCarran-Ferguson Act bars a federal remedy which affects a matter subject to state insurance regulation. In the circumstances of this particular case, we do not think it does; without intimating any opinion about what remedies would be appropriate should a violation be found after a trial on the merits, we hold that the McCarran-Ferguson Act furnishes no reason for refusing the remedies the Commission is seeking.[5]

The Commission alleged that approval of the merger was obtained through the use of various fraudulent misrepresentations. It did not ask the trial court to pass directly upon a merger which the State Director of Insurance had approved. No question of the legality or illegality of the merger, standing alone, was raised. The gravamen of the complaint was the misrepresentation, not the merger. The merger became relevant only insofar as it was necessary to attack it in order to undo the harm caused by the alleged deception. Presumably, full

---

[5] Although the District Court held that some of the relief requested was beyond that properly allowable under § 21 (e) of the 1934 Act, 48 Stat. 900, as amended, 15 U. S. C. § 78u (e), no such question has been argued by either party here. Accordingly, we express no opinion about the proper construction of that section. See Note, Ancillary Relief in SEC Injunction Suits for Violation of Rule 10b–5, 79 Harv. L. Rev. 656 (1966).

disclosure would have avoided the particular Rule 10b–5 violations alleged in the complaint. Nevertheless, respondents contend that any attempt to interfere with a merger approved by state insurance officials would "invalidate, impair, or supersede" the state insurance laws made paramount by the McCarran-Ferguson Act. We cannot accept this overly broad restriction on federal power.

It is clear that any "impairment" in this case is a most indirect one. The Federal Government is attempting to protect security holders from fraudulent misrepresentations; Arizona, insofar as its activities are protected by the McCarran-Ferguson Act from the normal operations of the Supremacy Clause, is attempting to protect the interests of the policyholders. Arizona has not commanded something which the Federal Government seeks to prohibit. It has permitted respondents to consummate the merger; it did not order them to do so. In this context, all the Securities and Exchange Commission is asking is that insurance companies speak the truth when talking to their shareholders. The paramount federal interest in protecting shareholders is in this situation perfectly compatible with the paramount state interest in protecting policyholders. And the remedy the Commission seeks does not affect a matter predominantly of concern to policyholders alone; the merger is at least as important to those owning the companies' stock as it is to those holding their policies. In these circumstances, we simply cannot see the conflict. Different questions would, of course, arise if the Federal Government were attempting to regulate in the sphere reserved primarily to the States by the McCarran-Ferguson Act. But that is not this case. In these circumstances, there is no reason to emasculate the securities laws by forbidding remedies which might prove to be essential. Cf. *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964). On remand,

the trial court may order a return to the *status quo ante* if it finds that course of action desirable, necessary, and otherwise lawful.

## III.

Respondents argue that there are alternative grounds on which the lower courts' action in granting judgment on the pleadings can be sustained. They contend that the complaint fails to allege a "purchase or sale" of securities within the meaning of § 10 (b) and the Commission's Rule 10b–5, and that in any case Rule 10b–5 does not apply to misrepresentations in connection with the solicitation of proxies.[6] Since this case is here in the context of an appeal from the pretrial dismissal of a complaint, a simple remand would leave the lower

---

[6] Section 10 (b) of the Securities Exchange Act of 1934, 48 Stat. 891, 15 U. S. C. § 78j (b), provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . . .

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, 17 CFR § 240.10b–5 (1968), provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

courts with nothing more on which to base a decision than the record presently before this Court. In addition, further delays in resolving this controversy might increase the difficulty of fashioning effective relief. Accordingly, we think it desirable to dispose of these two issues before remanding the case so that the trial court may go forward with further proceedings without undue delay.

Although § 10 (b) and Rule 10b–5 may well be the most litigated provisions in the federal securities laws, this is the first time this Court has found it necessary to interpret them. We enter this virgin territory cautiously. The questions presented are narrow ones. They arise in an area where glib generalizations and unthinking abstractions are major occupational hazards. Accordingly, in deciding this particular case, remembering what is not involved is as important as determining what is. With this in mind, we turn to respondents' particular contentions.

Respondents argue that the complaint fails to allege any misstatements "in connection with the purchase or sale of any security," as is required by both the statute and the rule. They rely upon the so-called "no-sale doctrine" presently set forth in the Commission's Rule 133 under the Securities Act of 1933, 17 CFR § 230.133 (1968).[7] That rule, promulgated under the Commission's authority to define "accounting, technical, and trade terms" used in the 1933 Act, § 19 (a), 48 Stat. 85, as amended, 15 U. S. C. § 77s, sets forth various situations involving statutory mergers and other types of corporate reorganizations, and declares that no "sale" or "offer" shall be deemed to be involved. But whatever may be the validity or effect of this rule—and we intimate

---

[7] For the history of this doctrine, see 1 L. Loss, Securities Regulation 518–542 (1961).

absolutely no opinion on these questions—it certainly does not determine the result here. The rule is specifically made applicable only to cases involving § 5 of the 1933 Act; this case arises under § 10 (b) of the 1934 Act. Although the interdependence of the various sections of the securities laws is certainly a relevant factor in any interpretation of the language Congress has chosen, ordinary rules of statutory construction still apply. The meaning of particular phrases must be determined in context, *SEC* v. *C. M. Joiner Leasing Corp.*, 320 U. S. 344, 350–351 (1943). Congress itself has cautioned that the same words may take on a different coloration in different sections of the securities laws; both the 1933 and the 1934 Acts preface their lists of general definitions with the phrase "unless the context otherwise requires." 1933 Act, § 2, 48 Stat. 74, 15 U. S. C. § 77b; 1934 Act, § 3, 48 Stat. 882, 15 U. S. C. § 78c. We must therefore address ourselves to the meaning of the words "purchase or sale" in the context of § 10 (b). Whatever these or similar words may mean in the numerous other contexts in which they appear in the securities laws, only this one narrow question is presented here.

Section 10 (b) and Rule 10b–5 together constitute one of the several broad antifraud provisions contained in the securities laws. In the context of this case, the Commission seeks to apply them to prevent the shareholders of Producers from being defrauded as a result of misstatements made by respondents. For the statute and the rule to apply, the allegedly proscribed conduct must have been "in connection with the purchase or sale of any security." The relevant definitional sections of the 1934 Act are for the most part unhelpful; they only declare generally that the terms "purchase" and "sale" shall include contracts to purchase or sell. §§ 3 (a)(13), (14), 48 Stat. 884, 15

U. S. C. §§ 78c (a)(13), (14).[8]   Consequently, we must ask whether respondents' alleged conduct is the type of fraudulent behavior which was meant to be forbidden by the statute and the rule.

According to the amended complaint, Producers' shareholders were misled in various material respects prior to their approval of a merger.   The deception furthered a scheme which resulted in their losing their status as shareholders in Producers and becoming shareholders in a new company.   Moreover, by voting in favor of the merger, each approving shareholder individually lost any right under Arizona law to obtain an appraisal of his stock and payment for it in cash.   Ariz. Rev. Stat. Ann. § 10–347 (1956).   Whatever the terms "purchase" and "sale" may mean in other contexts, here an alleged deception has affected individual shareholders' decisions in a way not at all unlike that involved in a typical cash sale or share exchange.   The broad antifraud purposes of the statute and the rule would clearly be furthered by their application to this type of situation.   Therefore we conclude that Producers' shareholders "purchased" shares in the new company by exchanging them for their old stock.[9]   As the Court of Appeals for the Seventh Circuit has said, "This view does no violence to the statutory language, and is the

---

[8] These sections do indicate the breadth of the statutory terms by using the definitional word "include" and by including within the definitions contracts "to buy, purchase, or otherwise acquire" and "to sell or otherwise dispose of" securities.

[9] This case presents none of the complications which may arise in determining who, if anyone, may bring private actions under § 10 (b) and Rule 10b-5. Cf. *J. I. Case Co.* v. *Borak*, 377 U. S. 426 (1964). This is a suit brought by the Commission; the terms "purchase" and "sale" are relevant only to the question of statutory coverage. Therefore there are no "standing" problems lurking in the case. Cf. Lowenfels, The Demise of the *Birnbaum* Doctrine: A New Era for Rule 10b-5, 54 Va. L. Rev. 268 (1968).

present interpretation of the body which is responsible for the administration of the acts." *Dasho* v. *Susquehanna Corp.,* 380 F. 2d 262, 269 (opinion of Fairchild and Cummings, JJ.), cert. denied, *sub nom. Bard* v. *Dasho,* 389 U. S. 977 (1967); see *Vine* v. *Beneficial Finance Co.,* 374 F. 2d 627 (C. A. 2d Cir.), cert. denied, 389 U. S. 970 (1967); cf. *Ruckle* v. *Roto American Corp.,* 339 F. 2d 24 (C. A. 2d Cir. 1964).

Respondents' alternative argument that Rule 10b–5 does not cover misrepresentations which occur in connection with proxy solicitations can be dismissed rather quickly. Section 14 of the 1934 Act, 48 Stat. 895, 15 U. S. C. § 78n, and the rules adopted pursuant to that section, 17 CFR §§ 240.14a–1 to 240.14a–103 (1968), set up a complex regulatory scheme covering proxy solicitations. At the time of the conduct charged in the complaint, these provisions did not apply to respondents; the 1964 amendments to the Securities Exchange Act would have made them applicable later if certain conditions relating to state regulation had not been met. 78 Stat. 567, 15 U. S. C. § 78*l* (g)(2)(G). But the existence or nonexistence of regulation under § 14 would not affect the scope of § 10 (b) and Rule 10b–5. The two sections of the Act apply to different sets of situations. Section 10 (b) applies to all proscribed conduct in connection with a purchase or sale of any security; § 14 applies to all proxy solicitations, whether or not in connection with a purchase or sale. The fact that there may well be some overlap is neither unusual nor unfortunate. Nor does it help respondents that insurance companies may often be exempt from federal proxy regulation under the 1964 amendments. The securities laws' exemptions for insurance companies and insurance activities are carefully limited. None is applicable to the Rule 10b–5 situation with which we are confronted, and we do not have the power to create one. Congress

may well have concluded that the Commission's general antifraud powers over purchases and sales of securities should continue to apply to insurance securities, even though the more detailed regulation of proxy solicitations—which may often be conducted in connection with the managerial activities of insurance companies—was left to the States. Accordingly, we find no bar to the application of Rule 10b–5 to respondents' misstatements in their proxy materials.

Since the McCarran-Ferguson Act does not prohibit the relief sought, and since neither of the alternative grounds for dismissal which have been raised here is meritorious, we reverse the judgment of the Court of Appeals and remand the case to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACK, believing that the United States Court of Appeals for the Ninth Circuit correctly analyzed the issues in this case and that its judgment is right, dissents from this Court's reversal of the judgment.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring in part and dissenting in part.

I concur entirely in Parts I and II of the Court's opinion construing the McCarran-Ferguson Act. But I am at a loss to understand why the Court finds it necessary to go further and construe Rule 10b–5 promulgated under § 10 (b) of the Securities Exchange Act of 1934. The Court of Appeals did not reach this question since it believed that the McCarran-Ferguson Act entirely exempted the transaction involved here from the commands of the federal securities laws. The Government's petition for certiorari is similarly limited. The only issue it raises is "[w]hether the McCarran-Ferguson Act . . . precludes the application of the anti-fraud provisions of

the Securities Exchange Act of 1934. . . ." See Petition for Certiorari 2. When the respondents' brief on the merits argued that Rule 10b–5 did not apply to the present case, the Solicitor General did not even attempt to present the Government's position on that score because he quite properly believed that "the question is not appropriately before this Court for decision." Government's Reply Brief 2.

Despite the fact that we have not heard the views of the Securities and Exchange Commission, the Court chooses this case as a vehicle to construe for the first time one of the most important and elusive provisions of the securities laws. Moreover, the decision has far-reaching radiations, despite the fact that the precise issue presented is a narrow one. Courts and commentators have long debated whether Rule 10b–5 should be read as a sweeping prohibition against fraud in the securities industry when this results in rendering nullities of the other antifraud provisions of more limited scope which can be found in the statute books. See, *e. g.*, §§ 11(a), 12 (2), and 13 of the Securities Act of 1933; § 18 of the Securities and Exchange Act of 1934. The late Judge Jerome Frank,[1] Professor Louis Loss,[2] and Milton Cohen,[3]—to mention only three of those particularly eminent in this field—have warned that Rule 10b–5 should not be construed to supersede the special statutory schemes which Congress has devised to assure fair dealing in various aspects of the securities business. But see A. Bromberg, Securities Law § 2.5 (1967); *Ellis* v. *Carter*, 291 F. 2d 270 (1961). Even those who take an extremely broad view of the scope of the Rule have recognized that it could well be argued that the courts should

---

[1] *Fischman* v. *Raytheon Manufacturing Co.*, 188 F. 2d 783 (1951).

[2] 3 Securities Regulation 1787–1791 (1961).

[3] "Truth in Securities" Revisited, 79 Harv. L. Rev. 1340, 1370 n. 89 (1966).

not rush in to apply § 10 (b) to regulate proxy solicitations where Congress has refused to permit the Commission to intervene under § 14. See Bromberg, *supra,* § 6.5 (2), n. 93.1. Indeed, at one time the SEC itself was of the opinion that the Rule did not apply in cases of this sort. *National Supply Co.* v. *Leland Stanford University,* 134 F. 2d 689, 694 (1943). Nevertheless, the majority believes it can answer this question "rather quickly," *ante,* at 468, without any real recognition of the basic principles which hang in the balance.

In addition, the Court has chosen to adopt a very loose construction of the requirement, first enunciated by Judge Augustus Hand in *Birnbaum* v. *Newport Steel Corp.,* 193 F. 2d 461 (1951), cert. denied 343 U. S. 956 (1952), that a transaction must involve a "purchase" or "sale" of securities before it may be found to violate Rule 10b–5. While some commentators have welcomed the erosion of this doctrine, see Lowenfels, The Demise of the *Birnbaum* Doctrine: A New Era for Rule 10b–5, 54 Va. L. Rev. 268 (1968), especially in injunction actions initiated by the SEC, Note, The Purchaser-Seller Limitation to SEC Rule 10b–5, 53 Cornell L. Rev. 684, 694–697 (1968), others believe that *"Birnbaum* seems basically correct." 3 L. Loss, Securities Regulation 1469. As recently as 1964, the Second Circuit rendered a decision which has been commonly understood to have reaffirmed the vitality of the *Birnbaum* doctrine, with my Brother MARSHALL casting the deciding vote. *O'Neill* v. *Maytag,* 339 F. 2d 764, 768 (1964); [4] see Lowenfels, *supra,* at 270.

---

[4] Both *O'Neill* and *Birnbaum* were of course private actions, and I do not mean to suggest that my Brother MARSHALL is flatly inconsistent in now ruling that the "purchase" and "sale" requirement has been met in this case involving the SEC's request for an injunction. Nevertheless, both private and public actions arise under the same Rule, and the legal problems involved in the two situations, while not identical, are closely related.

I am unwilling to decide these fundamental matters without full-dress argument. Indeed, if the courts of appeals are not to be permitted to develop the law in this area on a case-by-case basis, I think it much wiser for us to consider the basic issues in a case which squarely raises them rather than in one which is of marginal importance.