Opinion issued July 28, 2005
     













In The
Court of Appeals
For The
First District of Texas




NO. 01-05-00115-CV




IN RE MARGUERITE KEPKA, INDIVIDUALLY AND AS
REPRESENTATIVE OF THE ESTATE OF WILLIAM G. KEPKA,
DECEASED, Relator




Original Proceeding on Petition for Writ of Mandamus




O P I N I O N

          Relator, Marguerite Kepka, individually and as representative of the estate of
her deceased husband, William G. Kepka, seeks a writ of mandamus ordering the trial
court


 to vacate its November 10, 2004 order staying trial-court proceedings and
compelling arbitration of all of her claims against the real party in interest, Living
Centers of Texas d/b/a Southfield Healthcare Center (“Southfield”). We determine
whether (1) federal law pre-empted state law governing certain arbitration agreements
in the healthcare context and (2) Southfield carried its initial burden of showing that
Ms. Kepka agreed to arbitrate her wrongful-death claim, which she asserted in her
individual capacity. We conditionally grant the writ.
Background
          Mr. Kepka was admitted to Southfield’s nursing home on November 22, 2002.


 
In admitting her husband, Ms. Kepka signed multiple documents, including a
document entitled Agreement for Arbitration (“the arbitration agreement”). The
arbitration agreement provided in pertinent part as follows (the italicized text
indicates provisions that the parties entered in handwriting; the bolded text indicates
our emphasis):
          II.      AGREEMENT
 
The following is an agreement to arbitrate any dispute that might
arise between William Kepka (“Resident”) and/or Marguerite Kepka
(“Legal Representative”) and Southfield (“Facility) (“Facility” includes
the particular facility where the Resident resides, its parents, affiliates,
subsidiary companies, owners, officers, directors, medical directors,
employees, successors, assigns, agents, attorneys, and insurers). The
parties expressly agree and voluntarily enter into this binding
Arbitration Agreement (the “Agreement”). The Resident and the
Facility have entered into an Admission Agreement and acknowledge
that such Admission Agreement constitutes the foundation of the
relationship between them and all duties and obligations arising
between them. . . . This Agreement shall not apply to any dispute
where the amount in controversy is less than two hundred thousand
($200,000.00) dollars.
 
In consideration of this binding Agreement, the Facility and the
Resident acknowledge that they are agreeing to a mutual arbitration,
regardless of which party is making a claim; that the Facility agrees to
pay the fees of the arbitrators and up to $5,000.00 of reasonable and
appropriate attorney’s fees and costs for the Resident in any claims
against the Facility . . . . 
 
The parties agree that they shall submit to binding arbitration all
disputes against each other and their representatives, affiliates,
governing bodies, agents and employees arising out of or in any way
related or connected to the Admission Agreement and all matters
related thereto including matters involving the Resident’s stay and
care provided at the Facility, including but not limited to any
disputes concerning alleged personal injury to the Resident caused
by improper or inadequate care including allegations of medical
malpractice; any disputes concerning whether any statutory provisions
relating to the Resident’s rights under Texas law were violated; any
disputes relating to the payment or non-payment for the Resident’s care
and stay at the Facility; and any other dispute under state or Federal
law based on contract, tort, statute (including any deceptive trade
practices and consumer protection statutes), warranty or any alleged
breach, default, negligence, wantonness, fraud, misrepresentation or
suppression of fact or inducement.
 
. . .
 
It is the intention of the Facility and the Resident that this
Agreement shall inure to the benefit of and bind the Facility, its
parents, affiliates, and subsidiary companies, owners, officers,
representatives, directors, medical directors, employees, successors,
assigns, agents, attorneys and insurers; the Resident, his/her
successors, assigns, agents, attorneys, insurers, heirs, trustees, and
representatives, including the personal representative or executor
of his or her estate; and the Legal Representative, his/her successors,
assigns, agents, attorneys, insurers, heirs, trustees, and
representatives or executor of his or her estate.
 
. . .
 
          III.     ACKNOWLEDGMENTS
 
The execution of this Agreement is not a precondition to receiving
medical treatment or for admission to the Facility.
 
The Resident and/or Legal Representative understand(s) that
he/she has the right to consult with an attorney of his/her choice, prior
to signing this agreement, to receive explanations or clarification of any
of the terms of this Agreement.
 
The Resident and/or Legal Representative understand(s), agree(s)
to, and has received a copy of this Agreement, and acknowledges that
the terms have been explained to him/her, or his/her designee, by a
representative of the Facility, and that he/she has had an opportunity to
ask questions about this Agreement.
 
Each party agrees to waive the right to a trial, before a judge or
jury, for all disputes, including those at law or in equity, subject to
binding arbitration under this Agreement.
 
The Resident and/or Legal Representative understand(s) that this
agreement may be rescinded by giving written notice to the Facility
within 30 days of signature. If not rescinded within 30 days of
signature, this Agreement shall remain in effect for all claims arising
out of the Resident’s stay at the Facility. . . .
 
THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM
HAS READ THIS ENTIRE AGREEMENT AND UNDERSTANDS
THAT BY SIGNING THIS AGREEMENT EACH HAS WAIVED
HIS/HER RIGHT TO A TRIAL, BEFORE A JUDGE OR JURY, AND
THAT EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF
THE TERMS OF THE AGREEMENT.
          ____________________________       [signature] 11-21-02 
          Signature of Resident/Date                  Signature of Facility Representative
/Date
 
 M. Kepka 11-21-02 
Signature of Legal Representative/Date
(if signing on behalf of Resident)
 
____________________________
Signature of Legal Representative/Date
(if signing on his or her own behalf)

The arbitration agreement further provided that the Federal Arbitration Act


 (“FAA”)
would apply.



          On December 8, 2002, Mr. Kepka died. On August 19, 2003, Ms. Kepka sent
Southfield written notice that she intended to file suit under former Revised Civil
Statute article 4590i (“former article 4590i”). See Act of May 30, 1977, 65th Leg.,
R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2039-64, repealed by Act of June 2, 2003,
78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884 (current version at
Tex. Civ. Prac. & Rem. Code Ann. § 74.001-.507 (Vernon Supp. 2004-2005)). 
Nine days later, Ms. Kepka sued Southfield, Dr. Thandavarajan Gopalakrishnan d/b/a 
Southbelt Medical Clinic, and Virginia Chan, A.N.P. for negligence and gross
negligence arising out of Mr. Kepka’s care at the nursing home.


 Ms. Kepka asserted
her negligence claims under the Texas survival statute


 and the Texas wrongful-death
statute.


 For her wrongful-death negligence claim, Ms. Kepka alleged that she,
personally, had been damaged and sought compensation for pecuniary loss, loss of
companionship and society, mental anguish, and loss of inheritance. Ms. Kepka also
sought exemplary damages.
          Southfield first moved to compel arbitration and to dismiss or to stay trial
proceedings on July 1, 2004. Ms. Kepka opposed Southfield’s motion on various
grounds. On August 20, 2004, after having held a hearing, the trial court denied
Southfield’s motion to compel arbitration without specifying the grounds for its
ruling. Upon Southfield’s motion for reconsideration, however, the trial court granted
the motion to compel arbitration on November 10, 2004, again without stating the
grounds for its ruling; stayed the cause pending the conclusion of arbitration; and sent
both Ms. Kepka’s wrongful-death and survival-statute claims against Southfield to
arbitration. It is from the November 10 order that Ms. Kepka seeks mandamus relief.
Standard of Review
          Mandamus is an appropriate means to review an order granting a motion to
compel arbitration, whether the FAA or the Texas General Arbitration Act


 (“TAA”)
applies to the arbitration agreement. Mohamed v. Auto Nation USA Corp., 89 S.W.3d
830, 834 (Tex. App.—Houston [1st Dist.] 2002, no writ) (combined appeal & orig.
proceeding). In this mandamus proceeding, we review the trial court’s order
compelling arbitration for a clear abuse of discretion. See TransAmerican Natural
Gas Corp. v. Powell, 811 S.W.2d 913, 917 (Tex. 1991); see also Jack B. Anglin Co.
v. Tipps, 842 S.W.2d 266, 271 (Tex. 1992). A trial court abuses its discretion when
it errs in determining what the law is or in applying the law to the facts. In re Bruce
Terminix Co., 988 S.W.2d 702, 703 (Tex. 1998).
The Law Applicable to Arbitration
          A party seeking to compel arbitration has the initial burden both (1) to establish
the arbitration agreement’s existence and (2) to show that the claims asserted against
the movant fall within the arbitration agreement’s scope. Mohamed, 89 S.W.3d at
835.
 
          “Whether an enforceable agreement to arbitrate exists is a legal question
entitled to de novo review.” Id. Part of the moving party’s initial burden of
establishing the arbitration agreement’s existence is to show that the entity against
whom it seeks enforcement is a party to the agreement or is nonetheless bound by the
agreement. See id. (“‘A party cannot be required to arbitrate unless it has agreed to
do so.’”) (quoting Trico Marine Servs., Inc. v. Stewart & Stevenson Technical Servs.,
73 S.W.3d 545, 548 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (combined appeal
& orig. proceeding)); Fleetwood Enters., Inc. v. Gaskamp, 280 F.3d 1069, 1073-74
(5th Cir. 2002) (considering question of “who must arbitrate” to be aspect of
movant’s burden of showing valid agreement to arbitrate); cf. Mohamed, 89 S.W.3d
at 836 (holding, “The initial burden of the party seeking to compel arbitration—to
establish the arbitration agreement’s existence—includes proving the entity seeking
to enforce the arbitration agreement was a party to it or had the right to enforce the
agreement notwithstanding”; also holding, “An entity’s burden to prove it is a
signatory exists because arbitration is a creature of contract . . . .”). Moreover,
although there exists a strong presumption favoring arbitration, “the presumption
arises only after the party seeking to compel arbitration proves that a valid arbitration
agreement exists.” J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 227 (Tex. 2003);
Gaskamp, 280 F.3d at 1073 & 1073 n.5 (stating, “In determining whether the dispute
falls within the scope of the arbitration agreement, ‘ambiguities are resolved in favor
of arbitration.’ However, this federal policy favoring arbitration does not apply to the
determination of whether there is a valid agreement to arbitrate between the parties
. . . .”; further holding, “[T]he federal policy favoring arbitration does not extend to
a determination of who is bound . . . .”) (citations omitted). Additionally, “‘[t]he
parties’ agreement to arbitrate must be clear. In this determination, Texas contract
law applies’”; the determination involves a question of law if the agreement is
unambiguous. Mohamed, 89 S.W.3d at 835 (quoting Trico Marine Servs., 73 S.W.3d
at 548).
          To carry its other initial burden of showing that the claims asserted against it
fall within the arbitration agreement’s scope—when, as here, the arbitration
agreement uses broad language such as “arising out of or in any way related or
connected to” to define the scope of arbitrability—the moving party must show that
the factual allegations against it “touch matters” covered by the underlying
agreement. Hou-Scape, Inc. v. Lloyd, 945 S.W.2d 202, 205-06 (Tex. App.—Houston
[1st Dist.] 1997, orig. proceeding). There is a strong federal policy favoring
arbitration. Id. at 205 (applying federal law to determine scope of arbitration
agreement because FAA applied). “An order to arbitrate should not be denied unless
it can be said with positive assurance that the arbitration clause is not susceptible of
an interpretation that covers the asserted dispute.” Id. Accordingly, “[a]ny doubts
concerning the scope of arbitrable issues should be resolved in favor of arbitration.” 
Id.
          “If the party seeking arbitration carries its initial burden, the burden then shifts
to the party resisting arbitration to present evidence on its defenses to the arbitration
agreement.” Mohamed, 89 S.W.3d at 835.
Effect of Failure to Comply with Former Article 4509i, Section 15.01
          In issues one through four, Ms. Kepka asserts that the entire arbitration
agreement was invalid, and thus that the trial court erred in sending either of her
claims to arbitration, for four reasons. We need address only Ms. Kepka’s issues two
and four.
          In issue two, Ms. Kepka asserts that the trial court abused its discretion in
sending both of her claims to arbitration because the arbitration agreement did not
comply with former article 4590i, section 15.01’s requirements concerning arbitration
agreements. See Act of May 25, 1993, 73rd Leg., R.S., ch. 625, § 4, 1993 Tex. Gen.
Laws 2347, 2349-50, repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, §
10.09, 2003 Tex. Gen. Laws 847, 884 (current version at Tex. Civ. Prac. & Rem.
Code Ann. § 74.451 (Vernon Supp. 2004-2005)). Former 4590i, section 15.01(a)
provided, in pertinent part:
(a)No physician, professional association of physicians, or other
health care provider shall request or require a patient or prospective
patient to execute an agreement to arbitrate a health care liability claim
unless the form of agreement delivered to the patient contains a written
notice in 10-point boldface type clearly and conspicuously stating:
 
UNDER TEXAS LAW, THIS AGREEMENT IS
INVALID AND OF NO LEGAL EFFECT UNLESS IT IS
ALSO SIGNED BY AN ATTORNEY OF YOUR OWN
CHOOSING. THIS AGREEMENT CONTAINS A
WAIVER OF IMPORTANT LEGAL RIGHTS,
INCLUDING YOUR RIGHT TO A JURY. YOU
SHOULD NOT SIGN THIS AGREEMENT WITHOUT
FIRST CONSULTING WITH AN ATTORNEY.

Id. No one disputes that the arbitration agreement did not comply with former 4590i,
section 15.01(a). 
          Rather, Southfield asserts (as it did below) that the FAA, which does not
contain the specific requirement quoted above, pre-empts former 4590i, section
15.01(a); accordingly, Southfield argues that the arbitration agreement was
enforceable under the FAA despite its not complying with this Texas statute. Ms.
Kepka did not dispute below, and does not contest in this Court, Southfield’s
assertion that the FAA pre-empts former 4590i, section 15.01(a)’s requirements
quoted above.


 Instead, in issue four, Ms. Kepka asserts that another federal
statute—the McCarran-Ferguson Act


 (“the MFA”)—“reverse pre-empts” the FAA,
preventing the FAA from pre-empting former 4590i, section 15.01(a)’s quoted
requirements. If we sustain issue four, then we must also sustain issue two; if we
overrule issue four, we must also overrule issue two. We thus discuss issue four first.
          The MFA provides, in pertinent part:
No Act of Congress shall be construed to invalidate, impair, or
supersede any law enacted by any State for the purpose of regulating
the business of insurance, or which imposes a fee or tax upon such
business, unless such Act specifically relates to the business of
insurance; Provided, That . . . the Act . . . known as the Sherman Act,
and the Act . . . known as the Clayton Act, and the Act . . . known as the
Federal Trade Commission Act . . . shall be applicable to the business
of insurance to the extent that such business is not regulated by State
law.

15 U.S.C.S. § 1012(b) (West 1984) (italics in original; bolding added for emphasis). 
Accordingly, under the first clause quoted above, the MFA will prevent a federal
statute from pre-empting a state statute “if ‘(1) the federal statute does not specifically
relate to the “business of insurance,” (2) the state law was enacted for “the purpose
of regulating the business of insurance,” and (3) the federal statute operates to
“invalidate, impair, or supersede” the state law.’” Bodine v. Webb, 992 S.W.2d 672,
677 (Tex. App.—Austin 1999, pet. denied) (quoting Munich Am. Reinsurance Co. v.
Crawford, 141 F.3d 585, 590 (5th Cir. 1998)). The only element at issue in this case
is the second: whether former article 4590i—and specifically, section 15.01—was
enacted for the purpose of regulating the business of insurance.
          “‘Statutes aimed at protecting or regulating this relationship [between insurer
and insured], directly or indirectly, are laws regulating “the business of insurance,”’
within the meaning of” the first clause of MFA section 1012(b), which contains the
bolded text above. United States Dept. of the Treasury v. Fabe, 508 U.S. 491, 501,
113 S. Ct. 2202, 2208 (1993) (quoting SEC v. Nat’l Secs., Inc., 393 U.S. 453, 460, 89
S. Ct. 564, 568 (1969)) (bracketed text in original). The emphasis of the MFA’s first
clause is upon
“[t]he relationship between insurer and insured, the type of policy which
could be issued, its reliability, interpretation, and enforcement—these
were the core of the ‘business of insurance.’ Undoubtedly, other
activities of insurance companies relate so closely to their status as
reliable insurers that they too must be placed in the same class. But
whatever the exact scope of the statutory term, it is clear where the focus
was—it was on the relationship between the insurance company and the
policyholder.”

Id. (quoting Nat’l Secs., Inc., 393 U.S. at 460, 89 S. Ct. at 568). “The broad category
of laws enacted ‘for the purpose of regulating the business of insurance’ consists of
laws that possess the ‘end, intention, or aim’ of adjusting, managing, or controlling
the business of insurance.” Id., 508 U.S. at 505, 113 S. Ct. at 2210 (quoting Black’s
Law Dict. 1236, 1286 (6th ed. 1990)). There is precedent for examining the
particular state act as a whole, rather than just the portion of the act alleged to be in
conflict with federal law, when determining whether the state act was enacted “for the
purpose of regulating the business of insurance”;


 nonetheless, the U.S. Supreme
Court has also held that a state statute was enacted “for the purpose of regulating the
business of insurance” under the MFA—and thus that conflicting federal law did not
pre-empt the state law—only “to the extent that” the statute was aimed at protecting
or regulating the relationship between the insurer and insured.



          Ms. Kepka argues that former article 4590i, in its entirety, was enacted “for the
purpose of regulating the business of insurance” because the former article’s
“findings and purposes” section (former article 4590i, section 1.02) indicated that the
article was enacted with the purpose of controlling the escalating costs of professional
medical liability insurance. Southfield, in contrast, focuses only on section
15.01—the arbitration provision—arguing that the goal of this provision was to
regulate the relationship between health providers and their patients by protecting the
patients within that relationship, rather than to regulate the business of insurance.
          We disagree with Southfield that section 15.01 can be read in a vacuum for the
purpose of determining whether it was enacted “for the purpose of regulating the
business of insurance.” The “findings and purposes” section of former article 4590i
(section 1.02) contained legislative statements that applied to the statute as a whole
and provided:
(a)The Legislature of the State of Texas finds that:
 
(1)the number of health care liability claims (frequency) has
increased since 1972 inordinately;
 
(2)the filing of legitimate health care liability claims in Texas
is a contributing factor affecting medical professional liability
rates;
 
(3)the amounts being paid out by insurers in judgments and
settlements (severity) have likewise increased inordinately in the
same short period of time;
 
(4)the effect of the above has caused a serious public problem
in availability of and affordability of adequate medical
professional liability insurance;
 
(5)the situation has created a medical malpractice insurance
crisis in the State of Texas;
 
(6)this crisis has had a material adverse effect on the delivery
of medical and health care in Texas, including significant
reductions of availability of medical and health care services to
the people of Texas and a likelihood of further reductions in the
future;
 
(7)the crisis has had a substantial impact on the physicians and
hospitals of Texas and the cost to physicians and hospitals for
adequate medical malpractice insurance has dramatically risen in
price, with cost impact on patients and the public;
 
(8)the direct cost of medical care to the patient and public of
Texas has materially increased due to rising cost of malpractice
insurance protection for physicians and hospitals in Texas;

 
(9)the crisis has increased the cost of medical care both
directly through fees and indirectly through additional services
provided for protection against future suits or claims; and
defensive medicine has resulted in increasing cost to patients,
private insurers, and the state and has contributed to the general
inflation that has marked health care in recent years;
 
(10)satisfactory insurance coverage for adequate amounts of
insurance in this area is often not available at any price;
 
(11)the combined effect of the defects in the medical,
insurance, and legal systems has caused a serious public problem
both with respect to the availability of coverage and to the high
rates being charged by insurers for medical professional liability
insurance to some physicians, health care providers, and
hospitals;
 
(12)the adoption of certain modifications in the medical,
insurance, and legal systems, the total effect of which is currently
undetermined, may or may not have an effect on the rates charged
by insurers for medical professional liability insurance; 
 
. . . .
 
(b)Because of the conditions stated in Subsection (a) of this section, it is the
purpose of this Act to improve and modify the system by which health care
liability claims are determined in order to:
 
(1)reduce excessive frequency and severity of health care liability
claims through reasonable improvements and modifications in the Texas
insurance, tort, and medical practice systems;
 
(2)decrease the cost of those claims and assure that awards are
rationally related to actual damages;
 
(3)do so in a manner that will not unduly restrict a claimant’s rights
any more than necessary to deal with the crisis;
 
(4)make available to physicians, hospitals, and other health care
providers protection against potential liability through the insurance
mechanism at reasonably affordable rates;
 
(5)make affordable medical and health care more accessible and
available to the citizens of Texas;
 
(6)make certain modifications in the medical, insurance, and legal
systems in order to determine whether or not there will be an effect on
rates charged by insurers for medical professional liability insurance;
and
 
(7)make certain modifications to the liability laws as they relate to
health care liability claims only and with an intention of the legislature
to not extend or apply such modifications of liability laws to any other
area of the Texas legal system or tort law.

See Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02, 1977 Tex. Gen. Laws
2039, 2039-41, repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09,
2003 Tex. Gen. Laws 847, 884.
          It is clear from former section 1.02 that the purpose of the entire statute—even
those substantive provisions that did not expressly mention insurance


—was to
decrease the costs of health-care liability claims, through modifications of the
insurance, tort, and medical-practice systems, in order to make insurance reasonably
affordable so that health-care providers could have protection against potential
liability and so that citizens could have more affordable and accessible health care. 
Former article 4590i, section 15.01 was part of this overall scheme: the Legislature
not only intended to protect patients by it, but could also have determined that the
section’s protections could reduce litigation over arbitration agreements’
enforceability—thereby keeping down this aspect of litigation cost. Such an intent is
at least consistent with the stated purposes of “reduc[ing] excessive frequency and
severity of health care liability claims through reasonable improvements and
modifications in the Texas insurance, tort, and medical practice systems” and
“mak[ing] certain modifications in the medical, insurance, and legal systems in order
to determine whether or not there will be an effect on rates charged by insurers for
medical professional liability insurance.” See Act of May 30, 1977, 65th Leg., R.S.,
ch. 817, § 1.02, 1977 Tex. Gen. Laws 2039, 2041 (emphasis added). Therefore,
former article 4509i, including its section 15.01, was a “law[] enacted ‘for the
purpose of regulating the business of insurance’” because it “possess[ed] the ‘end,
intention, or aim’ of adjusting, managing, or controlling the business of insurance,”
that is, the relationship between health-care insurers and their insureds (health
providers).


 Fabe, 508 U.S. at 505, 113 S. Ct. at 2210.
          We draw support for our conclusion from the holding of the Colorado Supreme
Court in Allen v. Pacheco, on which Ms. Kepka relies, that the Colorado Health Care
Availability Act (“the Colorado statute”) was enacted for the purpose of regulating
the business of insurance within the meaning of the MFA, so that the FAA did not
pre-empt the Colorado statute’s provision concerning arbitration agreements. See 71
P.3d 375, 383-84 (Co. 2003). We realize that Pacheco is distinguishable to the extent
that the Colorado statute provided that:
[i]t is the intent of the general assembly that an arbitration agreement be
a voluntary agreement between a patient and a health care provider and
no medical malpractice insurer shall require a health care provider to
utilize arbitration agreements as a condition of providing medical
malpractice insurance to such health care provider. Making the use of
arbitration agreements a condition to the provision of medical
malpractice insurance shall constitute an unfair insurance practice . . .



and because the court was considering an arbitration agreement between a health-maintenance organization (“HMO”) and its individual insured, reasoning that “HMOs
simultaneously function as health care providers and health care insurers. “Given the
modern reality that HMOs have virtually replaced traditional health care insurers, the
relationship between an HMO ‘medical service provider’ and ‘patient’ is the
relationship between a ‘medical insurer’ and ‘insured.’” Id. at 383 n.9. Nonetheless,
the Pacheco court also held that
the fact that [the Colorado statute’s arbitration provision sections] apply
to “health care providers” instead of exclusively to insurers such as
HMOs does not nullify our conclusion that [these] sections . . . were
enacted for the “purpose of regulating the business of insurance.” As
long as the statute is not one of general applicability, it is not necessary
that the state statute relate only to insurance or that the statute be in the
form of an insurance code. Therefore, the fact that [these] sections
technically include non-insurer “health care providers” such as
physicians does not prevent these sections of the [Colorado statute]
from qualifying as statutes enacted “for the purpose of regulating the
business of insurance” under the meaning of the McCarran-Ferguson
Act.

Id. at 383-84 (emphasis added; citation omitted).
          Accordingly, we hold that the MFA prevents the FAA from pre-empting former
article 4590i, section 15.01(a)’s arbitration notice requirements.


 We thus further
hold that the trial court abused its discretion in implicitly concluding that former
article 4590i, section 15.01(a)’s notice requirements (1) were pre-empted by the FAA,
(2) did not apply to the arbitration agreement, and (3) did not invalidate that
agreement. Consequently, we also hold that the trial court erred in ordering either of
Ms. Kepka’s claims to arbitration.
          We sustain issues two and four. 
Wrongful-Death Claim
          Given that the above issue is one of first impression, we also discuss an
alternative challenge raised by Ms. Kepka that would provide her part of the relief
that she seeks.
          In her fifth issue, Ms. Kepka first asserts that the trial court abused its
discretion in compelling arbitration of her wrongful-death claim because (1) she
asserted that claim in her individual capacity and (2) she signed the arbitration
agreement only in her representative capacity, not in her individual capacity. She
alternatively asserts that the arbitration agreement’s scope does not extend to
wrongful-death claims because there is no express mention of “death” or “wrongful
death claim” in the section setting out the agreement’s scope. We need reach only
Ms. Kepka’s first argument.
A.      Ms. Kepka Was Not a Party to the Arbitration Agreement in Her
Individual Capacity

          “‘A party cannot be required to arbitrate unless it has agreed to do so.’” 
Mohamed, 89 S.W.3d at 835 (quoting Trico Marine Servs., 73 S.W.3d at 548). It is
undisputed that Ms. Kepka signed the arbitration agreement on the line indicating
“Signature of Legal Representative/Date (if signing on behalf of Resident),” rather
than on the signature line indicating “Signature of Legal Representative/Date (if
signing on his or her own behalf),” which Ms. Kepka left blank. It is axiomatic that
one signing a contract in her representative capacity is not bound by the contract in
her individual capacity. See Gracia v. RC Cola-7-Up Bottling Co., 667 S.W.2d 517,
519 (Tex. 1984) (holding that res judicata did not bar suit by woman in individual
capacity when she had signed prior agreed judgment only as next friend of daughter). 
Ms. Kepka was thus not a party to the arbitration agreement in her individual
capacity.
B.      Ms. Kepka, as a Non-Party, Could Not Be Compelled to Arbitrate Her
Claims

          “Federal courts have recognized six theories, arising out of common principles
of contract and agency law, that may bind non-signatories to arbitration agreements:
(1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5)
equitable estoppel; and (6) third-party beneficiary.” In re Kellogg Brown & Root,
Inc., No. 03-1129, 2005 WL 1187775, at *5 (Tex. May 20, 2005) (indicating, “Our
decision today rests on state law, but it is informed by persuasive and well-reasoned
federal precedent” such as that quoted above for determining when a non-signatory
may be compelled to arbitrate); see In re FirstMerit Bank, N.A., 52 S.W.3d 749, 755-56 (Tex. 2001) (holding non-signatory is subject to contract’s arbitration provision
when non-signatory sues based on contract to which arbitration provision is part); In
re Rangel, 45 S.W.3d 783, 787 (Tex. App.—Waco 2001, orig. proceeding) (holding
that non-signatory third-party beneficiary of contract containing arbitration clause
may be required to arbitrate its claims). Southfield neither argued any of these
grounds for requiring Ms. Kepka to arbitrate her claims to the trial court, nor asserts
them in this Court. Indeed, on the record presented to us, none of the six cited
theories appears to apply. Rather, Southfield asserts that
Ms. Kepka’s argument that the [arbitration] Agreement was not signed
in her individual capacity is without merit. As mentioned above, Ms.
Kepka’s voluntary assent to arbitrate “any claim” is binding in her
capacity as representative of the Estate of Mr. Kepka. Conversely, the
signatory line for Ms. Kepka to sign in her individual capacity would
apply to a hypothetical situation where she slipped and fell while
visiting a resident at the facility. Stated differently, a premises liability
issue in her individual capacity would not apply or in any way be borne
out of Mr. Kepka’s treatment which is governed by the admission
agreement to which the [arbitration] Agreement was incorporated. 
Therefore, unless Ms. Kepka is suing in tort for an individual injury she
sustained which is unrelated to care provided to Mr. Kepka, her
argument would simply not apply.

          When Ms. Kepka signed in her representative capacity, she signed as her
husband’s agent, nothing more. We know this because the arbitration agreement (1)
had a separate signature line that allowed Ms. Kepka to sign in her individual
capacity (and she left that line blank) and (2) repeatedly indicated that the agreement
was between the Facility and either “the Resident [Mr. Kepka] and/or the Legal
Representative [Ms. Kepka].” Because it contained these two signature lines, and
because it allowed the agreement with the Facility to be with the resident “and/or” his
legal representative, the arbitration agreement itself contemplated that one could sign
it in a representative capacity, in an individual capacity, or in both capacities.
          Wrongful-death claims are personal to the statutory beneficiaries who assert
the claims, and recovery for those claims does not benefit the estate. See Tex. Civ.
Prac. & Rem. Code Ann. § 71.004(a) (Vernon 1997) (“An action to recover
damages as provided by this subchapter is for the exclusive benefit of the surviving
spouse, children, and parents of the deceased.”); id. § 71.010(b) (Vernon 1997) (“The
damages awarded shall be divided, in shares as found by the jury in its verdict, among
the individuals who are entitled to recover and who are alive at that time.”); Shepherd
v. Ledford, 962 S.W.2d 28, 31 (Tex. 1998) (“An action to recover damages for
wrongful death is for the exclusive benefit of the deceased’s surviving spouse,
children, and parents.”); Palmer v. Coble Wall Trust Co., Inc., 851 S.W.2d 178, 181-82 (Tex. 1992) (noting that estate does not benefit from wrongful-death recovery). 
Because Ms. Kepka did not sign the arbitration agreement in her individual capacity,
and because Ms. Kepka’s wrongful-death claim was necessarily brought in her
individual capacity for damages personal to her, we hold that the trial court abused
its discretion in ordering her individual wrongful-death claim to arbitration. 
Southfield’s quoted argument confuses what claims fall within the arbitration
agreement’s scope with who can be bound by the agreement: we cannot consider
what categories of Ms. Kepka’s individual claims fall within the agreement’s scope
if she was not even a signatory to the agreement in that capacity.
          The arbitration agreement did provide, however, that it would inure to the
benefit of “the Resident [Mr. Kepka], his/her successors, assigns, agents, employees,
attorneys, insurers, heirs, trustees, and representatives, including the personal
representative or executor of his or her estate . . . .” (Emphasis added.) No one argues
in this Court that Ms. Kepka was a party to the arbitration agreement by virtue of her
being an “heir” or her falling under any other category of this quoted provision. 
Below, however, Southfield briefly referred the court to Allen v. Pacheco, in which
the Colorado Supreme Court, based on similar contractual language, held that a non-signatory wife’s wrongful-death claim was subject to arbitration under a contract
between her deceased husband and his HMO. See 71 P.3d at 378-81.
 
          Because the opinion could have been a basis for the trial court’s ruling, we
again visit the Pacheco opinion, this time for its holding on enforcement against a
non-signatory. The Pacheco court premised this holding on the rule that non-parties
who are in privity with a signatory may have the agreement enforced against them if
the signatories so intend. Id. at 379-80 & 380 n.4. The arbitration agreement in
Pacheco provided that it covered claims asserted “[b]y a Member, or by a Member’s
heir or personal representative, or by a person claiming that a duty to him or her
arises from a Member’s relationship with Health Plan, Hospitals or Medical Group
incident to this agreement . . . .” id. at 377. The court reasoned that the arbitration
contract was ambiguous as to whether a surviving wife was intended to be included
under the term “heir”: the Colorado wrongful-death statute did not include a wife as
an “heir,” but common usage could. Id. at 380. To reach its conclusion that a wife
was an “heir” under the arbitration agreement, the Pacheco court applied the general
rule that any ambiguities in the scope of an arbitration agreement should be resolved
in favor of arbitration. Id. at 381. Accordingly, the court held that the wife, although
a non-signatory, was subject to the arbitration agreement. Id. at 381.
          We respectfully decline to follow this holding of Pacheco. First, the Pacheco
court’s holding blends together the determination of what claims fall within an
agreement’s scope and the determination of who can be bound by the agreement. Our
state supreme court has held that the presumptions and strong policy favoring
arbitration have no application until after the movant has shown the existence of a
valid arbitration agreement. See Webster, 128 S.W.3d at 227; see also Gaskamp, 280
F.3d at 1073 & 1074 n.5. Part of the burden of showing a valid arbitration
agreement’s existence is showing that the entity against whom the movant seeks
enforcement is either a party to the agreement or a non-party who may nonetheless
have the agreement enforced against it. See Gaskamp, 280 F.3d at 1073-74; see also
Mohamed, 89 S.W.3d at 835 (“‘A party cannot be required to arbitrate unless it has
agreed to do so.’”). Accordingly, Texas courts would not apply the favorable-to-arbitration presumption that the Pacheco court applied to resolve an ambiguity about
which non-signatories were bound by the arbitration agreement.
          Second, the term “heir” is not necessarily ambiguous in the context of this
arbitration agreement. An arbitration agreement may recognize that certain non-parties who have the appropriate sort of privity with one of the signatories—those
such as assignees, agents, subrogated insurers, representatives, trustees, third-party
beneficiaries, etc.—are bound by the agreement because those types of non-parties
“stand in the shoes” of one of the signatories, are authorized to make decisions on a
signatory’s behalf or for its benefit, were intended to benefit from the signatories’
contract, or the like. Cf. In re Kellogg Brown & Root, Inc., 2005 WL 1187775 at *5
(setting out ways in which non-signatory to arbitration agreement may nonetheless
be bound by agreement); In re Rangel, 45 S.W.3d at 787 (recognizing that non-signatory third-party beneficiary of arbitration contract may be required to arbitrate
claims). Some individuals who qualify as heirs might also fall within this type of
privity: for example, children or a surviving spouse who assert claims as the estate’s
representative on the estate’s behalf. However, under basic contract principles,
parties to an arbitration agreement generally have no authority to bind by their
contract anyone who does not have the requisite privity with at least one of them or
with the contract itself to arbitrate anything. Cf. Mohamed, 89 S.W.3d at 835 (“‘A
party cannot be required to arbitrate unless it has agreed to do so.’”); Angroson, Inc.
v. Indep. Communications, Inc., 711 S.W.2d 268, 271 (Tex. App.—Dallas 1986, writ
ref’d n.r.e.) (holding, “[A] contract executed by an unauthorized agent, who makes
the agreement on behalf of another, not in his individual capacity, is not enforceable”
against the principal). A non-signatory wife, asserting in her individual capacity
personal statutory claims for damages such as her own mental anguish and loss of
consortium, earnings, companionship, society, and inheritance, lacks the type of
privity contemplated for the contracting parties to bind her to a contract that she did
not sign in her individual capacity. Simply put, a surviving wife may be an heir,
within the meaning of an arbitration agreement that she did not sign individually, to
her late husband’s claims; she cannot be an heir to her own claims.
          Third, we note that our wrongful-death statute (which grants a personal right
to the spouse, children, and parents) does not use the term “heir” at all, while the
survival statute (which establishes claims that are clearly derivative of the decedent’s
rights) provides that “[a] personal injury action survives to and in favor of the heirs,
legal representatives, and estate of the injured person.” Compare Tex. Civ. Prac.
& Rem. Code Ann. § 71.004(a)-(b) (Vernon 1997) (wrongful-death statute) with id.
§ 71.021(b) (Vernon 1997) (survival statute) (emphasis added). If anything, the
arbitration agreement’s use of the terms “heirs,” “representatives,” and “executor”
within the quoted clause implies that the contracting parties were not considering
those suing in their individual capacity for individual claims like wrongful death.
          Finally, the other categories of non-signatories besides “heirs” who are listed
in the quoted clause—successors, assigns, agents, attorneys, insurers, representatives,
and trustees—fall into the category of those who either stand in Mr. Kepka’s shoes
or who have authority to act for him, on his behalf, or for his benefit. It is, therefore,
reasonable to conclude that, when the contracting parties included “heirs” in this list,
they meant only to the extent that those heirs were functioning in the same capacity
as the others listed, i.e., not when the heirs were suing on their own behalf for their
own personal loss. Cf. CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.,
734 S.W.2d 653, 655 (Tex. 1987) (noting that “[t]he maxim expressio unius est
exclusio alterius, meaning that the naming of one thing excludes another,” though not
conclusive, was applicable to construction of settlement agreement).
          We sustain this portion of issue five. 
Conclusion
          Given our disposition, we need not reach issue one, issue three, or the
remainder of issue five.
          We conditionally grant mandamus relief and order the trial court to deny
Southfield’s motion to compel arbitration in its entirety. The writ will issue only if
the trial court fails to comply.
 


                                                             Tim Taft
                                                             Justice
 
Panel consists of Justices Taft, Keyes, and Hanks.